176 P.3d 977 (2008)
In the Interest of M.B., DOB: 08/01/2003, and A.B., DOB: 09/21/2001, Children Under Eighteen (18) Years of Age.
No. 98,387.
Court of Appeals of Kansas.
February 15, 2008.
*979 Nancy Orrick, of Olathe, for appellant natural father.
Steven J. Obermeier and Donald. W. Hymer, Jr., assistant district attorneys, for appellee state of Kansas.
J. Eugene Balloun, of Shook, Hardy & Bacon, L.L.P., for interested parties.
Alan W. Rosenak, of Overland Park, guardian ad litem.
Before CAPLINGER, P.J., MALONE, J., and LARSON, S.J.
MALONE, J.
R.B., a/k/a R.S., (Father) appeals the district court's decision terminating his parental rights to M.B. (d.o.b. 8/1/03) and A.B. (d.o.b. 9/21/01). Father claims the district court erred in failing to comply with the notice provisions of the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1901 et seq. (2000). He further claims the district court's decision *980 terminating his parental rights was not supported by substantial competent evidence. A.S. (Mother) did not appeal the district court's decision terminating her parental rights.

Factual and procedural history
On June 29, 2004, the State filed separate petitions, alleging that M.B. and A.B. were children in need of care (CINC). The children were removed from their home and placed in protective custody with the Kansas Department of Social and Rehabilitation Services (SRS). On October 27, 2004, Mother stipulated to an amended CINC petition. Based on evidence that Father was incarcerated, the court adjudicated both children to be in need of care. At the disposition hearing, the district court ordered Mother to participate in a 6-month reintegration plan.
At a review hearing on April 26, 2005, the district court was advised that Mother was not making progress on her reintegration plan and that the State would be seeking another form of permanency for the children. The cases were set for a permanency hearing and, while the district court declined to extend Mother's reintegration plan, the court urged Mother to continue to work toward reintegration.
On May 3, 2005, the State filed separate petitions requesting the district court to terminate Mother's and Father's parental rights to both children. The district court held a hearing on October 21, 2005. The majority of the testimony addressed Mother's neglect of the children and her failure to comply with the reintegration plan. The only testimony about Father concerned the fact that he was incarcerated and had no involvement with the children. The district court rendered its decision from the bench on November 22, 2005, and found that both Mother and Father were unfit parents and that the condition was unlikely to change in the foreseeable future. The district court terminated. Mother's and Father's parental rights to both children, and a journal entry was filed on December 1, 2005. On December 19, 2005, Father filed a timely notice of appeal. Mother did not appeal the district court's decision terminating her parental rights.
At no time during the proceedings was there any mention to the district court of the children's Native American heritage. In fact, the CINC petition had specifically alleged that the State had no information regarding American Indian heritage with regard to the children. On April 17, 2006, 4 months after filing his notice of appeal, Father filed a motion in the district court for an emergency hearing. In the motion, Father claimed that M.B. and A.B. were Indian children and that he was trying to complete the necessary paperwork to register the children with the Cherokee Nation. Father requested the district court to order SRS to sign the necessary paperwork. An emergency hearing was held on April 25, 2006. Because an appeal was pending, the district court took Father's request under advisement. Despite the district court's ruling taking Father's request under advisement, SRS, through its subcontractor, KVC Behavioral Healthcare, Inc. (KVC), subsequently registered the children with the Cherokee tribe. The district court was advised of the, registration during a permanency hearing for the children on June 28, 2006.
On August 3, 2006, the Court of Appeals received a letter from the Cherokee Nation informing the appeals court that the tribe had determined that M.B. and A.B. were both "Indian children" under the ICWA. After receiving this letter, the Court of Appeals ordered the parties to show cause why the case should not be remanded to the district court for further proceedings under the ICWA. Both parties responded to the show cause order and agreed that the case should be remanded to the district court. On September 19, 2006, the Court of Appeals dismissed the appeal and remanded the case to the district court for further proceedings pursuant to the ICWA.
After the remand order, the district court notified the Cherokee Nation of the CINC proceeding, and the Cherokee Nation participated in all subsequent hearings in the district court. The district court conducted a review hearing on October 18, 2006. At the hearing, the district court ordered all parties to file any motions they deemed appropriate as well as briefs in support of their positions *981 on what action the district court should take in order to comply with the ICWA. The district court invited the representative of the Cherokee Nation to submit a brief, as well.
On November 28, 2006, Father filed a motion to invalidate the proceedings. Father argued that because the district court had initially failed to notify the Cherokee Nation of the CINC proceedings, the district court was required to "start the case over" and set aside its prior rulings, including the order terminating parental rights and the CINC adjudication order. Although Mother had not appealed the termination order, she filed a motion to invalidate the prior orders as well.
The Cherokee Nation did not submit a formal pleading in response to the district court's request at the review hearing, but instead submitted an Indian Child Welfare Court Report dated November 29, 2006. The report indicated that the district court had not initially complied with the ICWA in terms of notifying the Cherokee Nation of the CINC proceedings. The report further recommended placement of the children within ICWA preferences in the absence of good cause to the contrary. However, the Cherokee Nation did not request that the case be transferred to tribal court or that any of the prior rulings be set aside. The Cherokee Nation made no request to present additional evidence to the district court regarding the termination of parental rights.
The district court conducted a hearing on December 7, 2006, and a representative of the Cherokee Nation appeared by telephone. All counsel agreed to submit the matter to the district court on stipulations and briefs. The State offered three exhibits into evidence which were admitted without objection. State's exhibit 1 was titled "Child Social History" for M.B., prepared by KVC, dated December 21, 2005. The document indicated that M.R. was 1/8th Cherokee, according to her great grandmother. The document further indicated that M.B. had not been raised in a Native American culture and that the parents had never stated a desire for M.B. to be raised in a Native American culture. State's exhibit 2 was titled "Family Assessment," prepared by SRS, dated July 2, 2004. On the first page of this document, the question, "Is child of native American ancestry?" was answered "No." State's exhibit 3 was titled "Background Information for Child," prepared by Mother for SRS, dated July 2, 2004. On page 2 of the exhibit, next to "Tribal affiliation, if applicable," Mother had written "Cherokee."
On February 16, 2007, the district court filed a memorandum decision which concluded that the ICWA applied to the case. However, the district court determined that the ICWA only applied prospectively from the time the court received notice of the children's Indian heritage. The district court found that the Cherokee Nation had the opportunity to participate in all court proceedings since that time and that any possible error had been remedied with the intervention of the tribe. The district court further noted that setting aside the prior rulings would not serve the purpose and intent of the ICWA. The district court denied both Mother's and Father's motions to invalidate the proceedings. Father timely appeals.

Compliance with ICWA
Father claims the district court erred in failing to comply with the notice provisions of the ICWA. This issue requires this court to interpret various provisions of the ICWA. Interpretation of a statute is a question of law over which an appellate court has unlimited review. In re E.T., 36 Kan.App.2d 56, 76, 137 P.3d 1035 (2006).
In general, the ICWA applies to any Child custody proceeding, including a termination of parental rights proceeding, involving an Indian child. 25 U.S.C. § 1903(1)(ii) (2000), 25 U.S.C. § 1911 (2000). The ICWA includes numerous provisions to further its purpose. These provisions can be divided into three categories: notice provisions, substantive provisions, and enforcement provisions.
Under the notice provisions, if "the court knows or has reason to know that an Indian child is involved," the social services agency must "notify . . . the Indian child's tribe, by registered mail with return receipt requested, *982 of the pending proceedings and of their right of intervention. If the identity or location of . . . the tribe cannot be determined, such notice shall be given to the [Bureau of Indian Affairs (BIA)]. . . . No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by . . . the tribe or the [BIA]." 25 U.S.C. § 1912(a) (2000).
Under the ICWA's substantive provisions, the Indian child's tribe has "a right to intervene at any point in the proceeding." 25 U.S.C. § 1911(c). As a condition of any foster care placement or termination of parental rights, the district court must find "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d). Under the ICWA, a court can only order termination of parental rights after it is satisfied beyond a reasonable doubt, supported by expert testimony, "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f).
Under the ICWA's enforcement provisions, the Indian child, a parent from whose custody an Indian child has been removed, or the Indian child's tribe can petition "any court of competent jurisdiction" to invalidate an "action for foster care placement or termination of parental rights" that violated the ICWA's notice or substantive provisions. 25 U.S.C. § 1914 (2000).
The ICWA's requirements have been further implemented and interpreted by (1) federal regulations, 25 C.F.R. § 23.1 et seq. (2007), and (2) federal Guidelines for State Courts (Guidelines), 44 Fed.Reg. 67,584 (Nov. 26, 1979). These Guidelines were created by the BIA and are "not intended to have binding legislative effect." 44 Fed.Reg. 67,584.
Father contends the district court failed to comply with the notice provisions of the ICWA because the court failed to notify the Cherokee Nation of the CINC proceedings in July 2004, when SRS was placed on notice of Mother's affiliation with the Cherokee tribe. According to Father, the district court had reason to know at that time that the children were Indian children. Thus, Father claims the district court erred in denying his motion to invalidate the proceedings. Father makes no claim on appeal that the district court failed to comply with any substantive provisions of the ICWA.
As noted by the State, it is clear that the district court did not have actual knowledge that M.B. and A.B. might be Indian children 'until April 2006 when Father filed his motion for an emergency hearing. A review of the record on appeal shows that nobody, including Mother or Father, ever directly informed the district court of the children's Indian heritage until after the court had terminated the parental rights.
The more difficult question is whether the district court had reason to know that M.B. and A.B. were Indian children prior to Father's motion. As previously indicated, the ICWA notice provisions apply if "the court knows or has reason to know that an Indian child is involved. . . ." (Emphasis added.) Neither the ICWA nor the controlling federal regulations define "reason to know." See 25 U.S.C. § 1912(a); 25 C.F.R. § 23.11(a) (2007). The Guidelines, however, clarify the notice provision by setting forth circumstances under which a district court would have a "reason to believe" that an Indian child was involved. These circumstances include:
"(i) Any party to the case, Indian tribe, Indian organization or public or private agency informs the court that the child is an Indian child.
"(ii) Any public or state-licensed agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child.

"(iii) The child who is the subject of the proceeding gives the court reason to believe he or she is an Indian child.
"(iv) The residence or the domicile of the child, his or her biological parents, or the Indian custodian is known by the court to be or is shown to be a predominantly Indian community.

*983 "(v) An officer of the court involved in the proceeding has knowledge that the child may be an Indian child." (Emphasis added.) Guidelines, § B.1.c, 44 Fed.Reg. 67,586.
See In re H.D., 11 Kan.App.2d 531, 535, 729 P.2d 1234 (1986) (court acknowledges circumstances under the Guidelines that trigger an inquiry of a child's Indian status).
Here, there is evidence that SRS knew about the children's Indian heritage in July 2004, within a few days after the CINC petitions were filed. On a form filled out by Mother for SRS dated July 2, 2004, Mother indicated that she was affiliated with the Cherokee tribe. Nevertheless, the State argues that the ICWA was inapplicable to both the adjudication hearing and the termination hearing because M.B. and A.B. were not Indian children at the time of these hearings. "Indian child" is defined as a child who is either (1) "a member of an Indian tribe" or (2) "eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (Emphasis added.) 25 U.S.C. § 1903(4). The State correctly points out that M.B. and A.B. were not enrolled members of an Indian tribe until after the termination hearing. Although the State acknowledges that M.B. and A.B. were eligible for membership in an Indian tribe, the State contends that neither parent was an enrolled member of an Indian tribe. Thus, according to the State, M.B. and A.B. were not Indian children at the time of either the adjudication hearing or the termination hearing under either prong of the statutory definition.
However, this court has previously noted that "`enrollment is not always required in order to be a member of a tribe. . . . Enrollment is the common evidentiary means of establishing Indian status, but it is not the only means nor is it necessarily determinative.' [Citation omitted.]" In re H.D., 11 Kan.App.2d at 535-36, 729 P.2d 1234. Thus, the fact that neither the children nor the parents were enrolled members of an Indian tribe at the time of either the adjudication hearing or the termination hearing is not conclusive evidence of the children's status as Indian children. More importantly, the determination of whether a child is an Indian child should be made by the Indian tribe rather than SRS or the district court. See Guidelines, § B.1 Commentary, 44 Fed.Reg. 67,586 (stating "[t]his guideline makes clear that the best source of information on whether a particular child is Indian is the tribe itself. It is the tribe's prerogative to determine membership criteria and to decide who meets those criteria.").
Although the July 2004 SRS document did not clearly establish Indian heritage, this document at least gave SRS a reason to believe that the children were Indian children. Under the Guidelines, SRS should have notified the district court of the children's Indian heritage in July 2004, so that the district court could have complied with the notice provisions of the ICWA. This would have allowed the Cherokee Nation to determine whether M.B. and A.B. were Indian children in July 2004, and the tribe could have decided at that time whether to participate in the CINC proceedings. To the extent that the district court failed to initially notify the Cherokee Nation of the CINC proceedings, the district court failed to comply with the requirements of the ICWA.
This determination, however, does not resolve the issue of whether the district court erred in denying Father's motion to invalidate the proceedings. There is no question the ICWA applied to this case and the district court needed to comply with its provisions. The real question to be resolved is whether the district court took appropriate remedial action sufficient to comply with the requirements of the ICWA once it determined that the Act applied.
In In re H.A.M., 25 Kan.App.2d 289, 961 P.2d 716 (1998), the State filed a CINC petition on November 4, 1994, involving three minor children. The children were members of the. Chickasaw Indian Nation, but the tribe initially did not receive notice of the CINC proceedings. The children were adjudicated in need of care and placed in SRS custody. The State subsequently filed a motion for termination of parental rights. In January 1997, over 2 years after the CINC petition was filed, the Chickasaw Indian Nation became involved in the case. At that time, the *984 district court found all three children were Indian children as defined in the ICWA and its provisions would apply. The biological mother filed a motion to transfer the case to tribal court, but the tribe declined the transfer. The district court heard the motion for termination in June 1997, and the court terminated the parental rights of both parents. 25 Kan.App.2d at 291-93, 961 P.2d 716.
On appeal, the parents claimed the district court failed to comply with the notice provisions of the ICWA. The biological mother specifically requested a reversal of the district court's termination order and requested additional time to allow her to work with the tribe to reunite her family. The Court of Appeals determined that the district court erred in not initially giving notice to the tribe of the CINC proceedings. 25 Kan.App.2d at 294, 961 P.2d 716. The court acknowledged that the parents had not been given a full opportunity to work with the tribe to preserve the family. However, considering the tribe's involvement in the case, albeit belated, the court determined there had been substantial compliance with the notice provisions of the ICWA. 25 Kan.App.2d at 295, 961 P.2d 716. The court held that "[i]f the provisions of the Indian Child Welfare Act are not initially followed, subsequent remedial acts may bring a Kansas termination of parental rights action into compliance with the requirements of the Act." 25 Kan.App.2d 289, Syl. ¶ 2, 961 P.2d 716.
In re H.A.M. is distinguishable from the present case because in In re H.A.M., the district court became aware that the children were Indian children prior to the termination of parental rights. Nevertheless, the case is significant because it stands for the proposition that even if the provisions of the ICWA are not initially followed, subsequent remedial action by the district court may bring a termination of parental rights case into compliance with the requirements of the Act. This is especially true when only the notice provisions of the ICWA are being challenged, and not the substantive provisions of the Act.
Here, the district court did not receive actual notice that M.B. and A.B. might be Indian children until after the order terminating parental rights was on appeal. From that point forward, however, the district court fully complied with the notice provisions of the ICWA. After the remand order, the district court notified the Cherokee Nation of the CINC proceedings, and the Cherokee Nation participated in all subsequent hearings in the district court. At the review hearing on October 18, 2006, the district court ordered all parties to file any motions they deemed appropriate. All parties, including the Cherokee Nation, were given the opportunity to file briefs concerning what action the district court should take in order to comply with the ICWA.
The Cherokee Nation's response to the district court's request at the review hearing is significant. The Cherokee Nation did not file any formal pleadings in the district court, but instead submitted an Indian Child Welfare Court Report. The report indicated that the district court had not initially complied with the ICWA in terms of notifying the Cherokee Nation of the CINC proceedings. The report further recommended placement of the children within ICWA preferences in the absence of good cause to the contrary. However, the Cherokee Nation did not request that the case be transferred to tribal court or that any of the prior rulings be set aside. The Cherokee Nation made no request to present additional evidence to the district court regarding the termination of parental rights.
The district court found that the Cherokee Nation had the opportunity to participate in all court proceedings once the court received notice of the children's Indian heritage, and that any possible error in giving notice to the Cherokee Nation had been remedied with the intervention of the tribe. The Cherokee Nation was certainly aware that it could have petitioned the district court to invalidate the termination of parental rights. See 25 U.S.C. § 1914. However, the Cherokee Nation did not request the district court to do so. Furthermore, the Cherokee Nation has not challenged any of the district court's rulings by participating in this appeal.
The district court ultimately concluded that the ICWA applied to the case, but that the Act applied only prospectively and not retroactively before the court received notice *985 of the children's Indian heritage. We do not adopt this analysis. The ICWA either applies to a case or it does not apply. Here, the ICWA is applicable because this case is a child custody proceeding involving Indian children, as these terms are broadly defined in the Act. However, we agree with the district court that any possible error in giving notice to the Cherokee Nation was remedied by the court's subsequent action and the intervention of the tribe. As previously indicated, Father does not claim on appeal that the district court failed to comply with any of the substantive provisions of the ICWA. For these reasons, we conclude the district court did not err in denying Father's motion to invalidate the proceedings. The district court's judgment will be upheld on appeal if it is determined to be correct for any reason. Hall v. Kansas Farm Bureau, 274 Kan. 263, 273, 50 P.3d 495 (2002).
Finally, Father argues that the district court erred in basing its decision in part on what has become known as the "existing Indian family doctrine." The existing Indian family doctrine, as recognized by many courts, precludes application of the ICWA when the Indian child's parent or parents have not maintained a significant social, cultural, or political relationship with an Indian tribe. In re Catholic Charities and Community Services of the Archdiocese of Denver, Inc., 942 P.2d 1380, 1382 (Colo.App.1997); see Rye v. Weasel, 934 S.W.2d 257, 261-63 (Ky.1996) (applied doctrine where there was no existing Indian family or environment); In re Adoption of Baby Boy L., 231 Kan. 199, 205-06, 643 P.2d 168 (1982) (implicitly applied doctrine where child had never been a member of an Indian home or culture); but see In re Baby Boy C., 27 App. Div.3d 34, 41-47, 805 N.Y.S.2d 313 (2005) (rejected doctrine as a judicially created exception contrary to plain language of ICWA); In re Baby Boy L., 103 P.3d 1099, 1103-06 (Okla. 2004) (rejected doctrine based on state legislation).
Here, the district court considered that setting aside the court's prior orders would not serve the purpose and intent of the ICWA. The district court noted that M.B. and A.B. are 1/8th Cherokee, with Indian heritage only on Mother's side of the family, and that the children were not enrolled in an Indian tribe until after their parents' rights had been terminated. The district court further noted that M.B. and A.B. were never raised in a home that practiced Indian culture. There had been no suggestion that preservation of the Indian culture was important to either Mother or Father in raising the children. Furthermore, there had been no suggestion that preservation of the Indian culture was important to anyone on either, side of the family. The district court found that "the raising of the issue of Indian heritage and the request to set aside CINC and termination of parental rights orders appears to be designed to delay permanency for the children, not to protect them."
However, the district court did not explicitly mention the existing Indian family, doctrine in its decision, and the district court did not rely on this doctrine in order to find that the ICWA did not apply to the case. In fact, the district court ultimately concluded that the ICWA applied to the case, but only prospectively from the time the court received notice of the children's Indian heritage. Because the district court did not expressly rely on the existing Indian family doctrine in reaching its decision, and because the court's decision can be upheld on other grounds, we decline to address the doctrine's application to the facts of this case.

Sufficiency of the evidence
Father claims the district court's decision terminating his parental rights was not supported by substantial competent evidence. He claims the mere fact that he was incarcerated throughout the CINC proceedings constituted insufficient evidence to terminate his parental rights.
Under the Kansas Code for Care of Children (Code), K.S.A. 38-1501 et seq., a court may terminate parental rights when the court finds by clear and convincing evidence that the parent is unfit "by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A.2005 Supp. 38-1583(a). We note that during the 2006 *986 legislative session, the Code was repealed and recodified in the Revised Kansas Code for Care of Children (K.S.A.2006 Supp. 38-2201 et seq.). L.2006, ch. 200, sec. 1 (Revised Code). The Revised Code became effective on January, 1, 2007. However, the Code provisions relied upon by the district court to terminate Father's parental rights have not substantially changed under the Revised Code.
An appellate court's standard of review in a termination of parental rights case is whether there is substantial competent evidence to support the district court's findings. Substantial evidence is such legal and relevant evidence as a reasonable person would accept as sufficient to support a conclusion. An appellate court does not reweigh the evidence or determine the credibility of witnesses. An appellate court reviews the evidence in the light most favorable to the prevailing party. In re C.B., 34 Kan.App.2d 317, 325, 117 P.3d 888, rev. denied 280 Kan. 982 (2005). However, the Kansas Supreme. Court has stated that in a CINC case, an appellate court must be able to discern that the State's evidence was clear and convincing. In re J.D.C., 284 Kan. 155, 170, 159 P.3d 974 (2007).
K.S.A.2005 Supp. 38-1583(b) lists nonexclusive factors the court shall consider in determining if terminating parental rights is in the best interests of the child. In re S.M.Q., 247 Kan. 231, 236, 796 P.2d 543 (1990). Also, K.S.A.2005 Supp. 38-1583(c) lists additional factors the court should consider when the child is not in the physical custody of the parent. Any one of the factors in K.S.A.2005 Supp. 38-1583(b) or (c) may be, but is not necessarily, sufficient to establish grounds for terminating parental rights, and all of the applicable factors are to be taken into account. K.S.A.2005 Supp. 38-1583(e). Those factors are, however, subordinate to the court's primary consideration of the physical, mental, or emotional condition and needs of the child. K.S.A.2005 Supp. 38-1583(e). The "foreseeable future" should be viewed from the child's perspective, not the parents', as time perception of a child differs from that of an adult. K.S.A. 38-1584(a); In re C.C., 29 Kan.App.2d 950, 954, 34 P.3d 462 (2001).
At the October 2005 termination hearing, the majority of the testimony addressed Mother's unfitness as a parent. Father correctly notes that there was very little testimony at the hearing regarding him. Christina Kohn, the case manager from July 2004 to July 2005, testified that she had never met Father because he had been incarcerated since June 2004. According to Kohn, during this time, she only received two letters for the children from Father. Kohn also testified that she developed a 6-month reintegration plan that included tasks for Mother to complete. Although never clearly stated at, the hearing, it appears that Father was never given a reintegration plan.
Phaedra Wade, another social worker involved in the case, testified that she never had contact with Father and that he had not been involved in the case. Mother testified that Father had been imprisoned since June 6, 2004, for possessing a firearm. Casie Shafer, a permanency case manger, testified that Father's mother had told her that Father would be released from prison in May 2006.
The journal entry of judgment indicated that Mother's and Father's parental rights were terminated under K.S.A.2005 Supp. 38-1583(b)(7) (reasonable efforts by appropriate agencies had been unable to rehabilitate family) and under K.S.A.2005 Supp. 38-1583(c)(3) (failure to carry out a reasonable reintegration plan). While these statutory provisions may have applied to Mother, these provisions did not apply to Father because the social agencies never attempted to work with Father and he was never assigned tasks under a reintegration plan. Thus, substantial competent evidence does not support the district court's findings that Father was unfit pursuant to either of these statutory provisions.
When the district court announced its ruling from the bench at the November 2005 hearing, the district court explained it was relying on two additional statutory provisions in terminating Father's parental rights:
"[Father has been] incarcerated. He has (sic) cannot be offered a reintegration *987 plan because of his being incarcerated. The father is presumed to be unfit pursuant to K.S.A. 38-1583(b)(4), in that he physically and emotionally neglected his children.
"K.S.A. 38-1583(b)(5), in that he has been convicted of a felony which is the basis of his current incarceration. He will not be out of [prison] for six months.
"His children cannot be expected to wait. This Court finds that the unfitness is unlikely to change in the foreseeable future."
K.S.A.2005 Supp. 38-1583(b)(4) allows the court to consider "physical, mental, or emotional neglect of the child" when deciding whether to terminate parental rights. K.S.A. 2005 Supp. 38-1583(b)(5) provides that a parent may be rendered unfit by conviction of a felony and imprisonment.
Father contends the State failed to prove either that he was imprisoned for the conviction of a felony or that his imprisonment prevented him from fulfilling his parental duties. He further argues that the State did not present any evidence demonstrating that he had neglected the physical or emotional needs of his children.
Father is correct that no one ever explicitly testified that Father had been convicted of a felony and was incarcerated because of the conviction. However, testimony at the termination hearing clearly established that Father had been convicted for "possessing a firearm." The testimony further established that. Father had been in prison since June 2004, and he would not be released until May 2006. For Father to receive an imprisonment term of 23 months, he must have been convicted of a felony. As such, substantial competent evidence supported the district court's finding that Father had been convicted of a felony and that he was incarcerated in prison based on the conviction.
Father argues that the district court erred in relying solely on his conviction and incarceration to terminate his parental rights. However, because incarceration is one of the express factors to be considered by the court pursuant to K.S.A.2005 Supp. 38-1583(b)(5), Father's incarceration alone could be sufficient evidence to support a conclusion of unfitness. As explained by the Kansas Supreme Court:
"When a nonconsenting parent is incarcerated and unable to fulfill the customary parental duties required of an unrestrained parent, the court must determine whether such parent has pursued the opportunities and options which may be available to carry out such duties to the best of his or her ability. It is obvious that a parent imprisoned for a long term cannot provide the customary parental care and guidance ordinarily required. If an imprisoned parent has made reasonable attempts to contact and maintain an ongoing relationship with his or her children, it is for the trial court to determine the sufficiency of such efforts." In re Adoption of EAR, 242 Kan. 231, 236, 747 P.2d 145 (1987).
Moreover, Father's incarceration also served as sufficient evidence to support the district court's reliance on K.S.A.2005 Supp. 38-1583(b)(4). Evidence was presented at the termination hearing that during the time Father was in prison, he failed to maintain a parental relationship with his children. Kohn testified that during the 1-year period during which she managed M.B.'s and A.B.'s cases, Father only sent the children two letters. This evidence supports the district court's finding that Father neglected the emotional and physical needs of his children.
The district court also concluded that Father's condition would not change in the foreseeable future. The evidence demonstrated that at the time of the October 2005 termination hearing, Father had 7 months remaining to serve on his 23-month prison sentence. In In re C.C., this court determined that parental incarceration for 30 months exceeded what is the "foreseeable future" in the eyes of a child. 29 Kan.App.2d at 954, 34 P.3d 462. In another case, In re D.T., 30 Kan.App.2d 1172, 1175, 56 P.3d 840 (2002), this court held that a parent's incarceration for just 10 additional months, in light of the parent's infrequent and superficial contact with the child while not incarcerated, sufficiently established the parent's inability to change in the foreseeable future from the viewpoint of a child.
*988 Here, A.B. was 4 years old and M.B. was 2 years old at the time of the termination hearing. Thus, at the time of the hearing, Father had already been incarcerated for a substantial' portion of the children's lives. Father had been incarcerated throughout the CINC proceedings, and he was facing an additional 7 months of imprisonment. The record shows that Father made almost no effort to establish or maintain a relationship with his children during his incarceration. We conclude this evidence was sufficient to establish that Father was an unfit parent and that the condition was unlikely to change in the foreseeable future from the children's point of view. Thus, the district court did not err in terminating Father's parental rights.
Affirmed.