NOT DESIGNATED FOR PUBLICATION

Nos. 113,569
113,786

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of E.M.
Year of Birth: 2010, A Male,
and
In the Interest of C.C.
Year of Birth: 2012, a Male.

MEMORANDUM OPINION

Appeal from Douglas District Court; PEGGY C. KITTEL, judge. Opinion filed December 23, 2015.
Affirmed.

*Tracy Fredley*, of Lawrence, for appellant natural father of E.M.

*Juanita M. Carlson*, of Carlson Law Office, of Lawrence, for appellant natural mother of E.M.
and C.C.

*Patrick J. Hurley*, assistant district attorney, *Charles E. Branson*, district attorney, *Derek Schmidt*,
attorney general, for appellee.

Before HILL, P.J., PIERRON and POWELL, JJ.

*Per Curiam*:  Mother, the natural mother of E.M. and C.C., and Father, the natural father
of E.M., appeal from the decision of the district court to terminate their parental rights.
Specifically, they maintain there was insufficient evidence to support the district court's findings
that they were unfit, that their unfitness was unlikely to change in the foreseeable future, and that
termination of their parental rights was in the children's best interests. We disagree and affirm.

1

On January 9, 2014, the Douglas County District Court entered an ex parte order placing E.M. and C.C. in protective custody with the Kansas Department for Children and Families (DCF) after a police welfare check of the family's motel room revealed drugs and drug paraphernalia within reach of the children. On January 14, 2014, the State filed a petition that sought to have E.M. and C.C. declared children in need of care (CINC). The children were placed in the temporary custody of DCF, and an adjudication hearing was scheduled for April 7, 2014. At the adjudication hearing, the district court adjudicated both E.M. and C.C. as CINCs.

A dispositional hearing was held on May 19, 2014. The district court determined that E.M. and C.C. should remain in DCF custody and adopted a permanency goal of reintegration. But the court warned Mother and Father that the case plan would likely change to adoption in the near future if their lack of progress on case plan tasks did not improve.

On December 1, 2014, the parties appeared at a permanency hearing, where the district court found that reintegration was no longer a viable goal because Mother and Father were not making adequate progress towards reintegration. Specifically, the court noted:

> "Both parents continue to either test positive for illegal substances or miss required UAs for testing; both parents struggle with homelessness and have shown inability to maintain employment. Both parents have been incarcerated during this case. The mother is currently in the county jail as of November 14, 2014 on a 270 day commit."

On December 19, 2014, the State filed a motion to terminate Mother's parental rights to E.M. and C.C. and Father's parental rights to E.M. The State's motion alleged

that Mother had been incarcerated since November 14, 2014, after entering a no contest plea to forgery and identity theft and was scheduled to be sentenced on December 29, 2014. The motion stated that Mother showed signs of hypomanic disorder bordering on bipolar, had previously been hospitalized due to aggressive behaviors, had posttraumatic stress disorder, admitted to past use of alcohol and drugs but was not always honest about her use, could not complete an intake to begin therapy while she was incarcerated, and failed to attend DCCCA services. With respect to Father, the State alleged that he had a history of depression, posttraumatic disorder, and co-dependent behavior with Mother; failed to provide proof of his lack of income; and failed to complete an updated RADAC assessment. The State further claimed that Mother and Father generally had not complied with the orders and case plan tasks for which they were responsible by failing to participate consistently in the UA call-in schedule or complete UAs as requested, testing positive for methamphetamines and/or amphetamines, and missing scheduled meetings and appointments with a parent trainer. The State also alleged that Mother and Father were currently homeless, had no income, had been inconsistent with visitation since the beginning of the case, and were often late and missed numerous visits due to their incarceration throughout the case.

Mother and Father attended the evidentiary hearing held on March 18, 2015. At the time of the hearing, E.M. was 4 years old, C.C. was 2 years old, and they had been in state custody for over 14 months. At the evidentiary hearing, the district court heard testimony from several witnesses, including the relevant testimony detailed below.

*Monica Luedtke*

KVC Supervisor Monica Luedtke testified that she began supervising the family's case in March 2014 and became the family's case manager as of December 2014. Luedtke identified the tasks Mother and Father were required to complete as part of their December 2014 case plan. With respect to Mother, Luedtke testified that she had

completed parenting and psychological evaluations but was not participating in individual therapy or drug treatment. Although there were parenting classes offered at the jail, Luedtke did not believe that Mother had engaged in any parent training. Luedtke testified that Mother's stay in jail had negatively impacted her ability to visit the children. Mother's incarceration had also impacted her ability to successfully complete drug treatment or show that she could maintain her sobriety or stable employment and housing. Luedtke testified that Mother would be incarcerated at least until August 2015 and did not believe that it would be in the children's best interests to wait another 5 months for Mother to start case plan tasks. Luedtke further testified that she would like to see Mother maintain 6 months of sobriety following her release before she would consider reintegration.

As for Father, Luedtke testified that he had completed parenting and psychological evaluations but had failed to successfully complete parent training. Father was participating in individual therapy but had not completed this case plan task because he had not received a successful discharge from the providing therapist. Luedtke stated that Father's parenting was appropriate during visits with E.M., but she had concerns that Father provided inappropriate snacks, given E.M.'s dental history. Luedtke agreed that Father and E.M. have a bond.

Luedtke's primary concern with Father was his substance abuse. Father did not call in or submit UAs consistently; he missed 23 UAs. In February 2015, Father submitted a UA that was positive for methamphetamine. Luedtke was also concerned with Father's failure to obtain and maintain stable housing. Although Father had recently gotten a job, Luedtke recommended a period of 3 to 6 months to show stability in employment.

Luedtke testified that although Father had made progress in carrying out case plan tasks and goals toward reintegration in the 2 months prior to the termination hearing, she observed that Father would often increase his case plan involvement prior to court

4

hearings and then his participation would fall off. Luedtke further testified that although Father had done fairly well achieving case plan tasks while Mother was incarcerated, there was very little follow-through when Father and Mother were together. Luedtke stated that Father's substance abuse was the primary barrier to reintegration; before reintegration could occur, Father would need to successfully complete inpatient treatment and maintain 6 months of sobriety. Other barriers to reintegration included obtaining and maintaining stable housing, maintaining employment, and engaging in couples therapy.

*Autumn Runyan*

Autumn Runyan, KVC permanency case manager, testified that she was the family's case manager from January to May 2014. Runyan participated in preparing the family's case plan, which required Mother and Father to (1) complete a parenting and psychological evaluation, (2) participate in parent training, (3) maintain stable housing, (4) maintain stable employment, (5) participate in visitation, and (6) call in and complete required UAs. Runyan spoke with Mother and Father at least monthly about the case plan tasks they needed to complete to achieve reintegration.

Runyan testified that neither Father nor Mother completed a parenting and psychological evaluation or completed parent training. According to Runyan, Mother and Father lived in hotels and with friends and were never able to obtain stable housing. Mother was also incarcerated in April and May 2014. Mother and Father each reported that they had obtained jobs, but Runyan never received proof that they were actually employed. Runyan testified that Mother and Father were initially consistent in attending visits, but in March they started arriving late and missing scheduled visits. During visits, Runyan had concerns about Mother and Father providing proper nutrition to the children. Father often failed to call in and only submitted 9 out of 21 UA requests. Two of Father's UA results were positive for methamphetamine and amphetamine. Runyan testified that Mother's RADAC evaluation recommended outpatient treatment, but she never

5

participated in any treatment. Runyan stated that she told Mother and Father that substance abuse was the main barrier to reintegration, but they made no progress in this regard during her time on the case.

*Cassie Noori*

Cassie Noori was the family's permanency case manager from June to December 2014. Noori testified that she communicated regularly with Mother and Father during this time, attempting to assist and work with them to complete case plan tasks and achieve reintegration. Noori stated that Mother completed a parenting and psychological evaluation in June 2014. The evaluation recommended individual counseling and couples therapy. Although Noori attempted to set up therapy services for Mother, Mother did not participate in therapy. Noori testified that Father completed a parenting and psychological evaluation in May 2014, which recommended individual counseling and couples therapy. She stated that Father did not complete a therapy intake until November 2014 and did not ever engage in therapy during Noori's time on the case. Noori testified that Father attended six parenting classes during June and July 2014 but missed some sessions thereafter.

According to Noori, the parents' visitation decreased from multiple days per week to a single weekly visit due to their history of missing visits and their lack of progress in the case, and the level of supervision during the visits increased. During Noori's time on the case, both parents missed at least three of their weekly visits with the children, and Mother missed more visits due to her incarceration. Noori observed Father during approximately 20 visits with E.M. Noori felt that Father's parenting ability was good and that he interacted well with E.M., but she had some concerns about Father's lack of engagement with E.M. and his failure to provide E.M. with proper nutrition.

Noori testified that the parents' main barrier to reintegration was substance abuse, with additional barriers being their inability to maintain stable housing and employment. Although Mother's RADAC evaluation recommended outpatient treatment, Mother did not engage in any such treatment or update her RADAC evaluation while Noori was on the case. Neither Mother nor Father regularly called in for required UAs. Mother missed approximately 20 UAs, and Father missed approximately 25. In addition, Mother and Father each submitted four UAs that tested positive for methamphetamine and amphetamines.

Noori further testified that she spoke with Mother and Father about housing resources, but Mother and Father did not have a permanent residence and mainly stayed with friends or in a tent in the yard of Father's mother. Noori spoke with Father about employment resources, but Mother and Father never maintained stable employment. Noori also claimed that Father would often complete tasks close to court dates.

*Eric Fitzmorris*

Eric Fitzmorris, Catholic Charities emergency assistance case manager, testified that Father contacted Catholic Charities in November 2014 to obtain housing assistance. At that time, Father was unemployed and living in his truck. Fitzmorris developed a housing stabilization plan with Father, which included health and employment goals. Although monthly contact was expected after creating a housing plan, Fitzmorris did not have any significant contact with Father thereafter until March 2015, when Father advised Fitzmorris that he had found a job. Father failed to appear at an appointment the following day.

*Father*

Father testified that he began using methamphetamine with Mother in January 2014, that he used it on a weekly basis, and that he had most recently used the drug approximately a week prior to the termination hearing. Father admitted that he did not call in every day or submit to required UAs as agreed in the case plan. Father stated that he completed a RADAC evaluation the day before the hearing and made excuses for why he had not completed one earlier. The evaluation recommended that Father complete inpatient rehabilitation in either Topeka or Wyandotte County. Father did not know how long he would be in inpatient treatment and was unsure how long the waiting period was at either facility. While waiting for a facility opening, Father had no plans for maintaining sobriety. Father did not attend any 12-step programs for assistance with his drug problem and did not receive any help from his family, but he stated that he would be willing to attend Narcotics Anonymous (NA) if he received information about it.

Father testified that he was trying to get his life together by completing the rehabilitation process, getting a job, and looking for an apartment. To that end, Father stated that he had been making minimum wage by working at College Hill Pizza Pub for about 2 weeks prior to the hearing. This was the first paid job Father had since prior to 2013. Father was not sure whether the job provided health insurance. He claimed that he would be able to return to the job following inpatient treatment. In the 2 weeks prior to the hearing, Father submitted rental applications to four apartment complexes. Father anticipated that Catholic Charities would pay for his deposit and first month's rent. Father admitted that he had signed a Catholic Charities Housing Stability Plan in November 2014 but had failed to complete the plan as of the date of the termination hearing. Specifically, Father had not consistently called in, set up checking and savings accounts, created a childcare continuing plan, or enrolled in classes at the adult education center.

Father admitted to missing parent training appointments. But Father felt that his visits with E.M. had gone well and stated that he had received good feedback from KVC. Father testified that he was currently attending mental health therapy for his depression and PTSD. Father's parenting evaluation also indicated that he had a co-dependency with Mother. Father was not on any medication for his conditions. Father stated that once Mother was released from jail, he intended to continue their relationship but would not do so if she failed to attend treatment or continued to use drugs. Father complained that KVC should have done more to help him but admitted that KVC had provided him with bus passes, gas cards, phone cards, call-in calendars, mental health appointments and appointment reminders, a list of community resources, and monthly meetings to discuss case plan tasks. Father also admitted that he did not ask his case workers where he could get additional help.

At the time of the hearing, Father was sleeping in his car purchased about a month before the hearing. Father stated that he was unsure how much more time he would need in order to reintegrate with E.M. and did not know whether he might use methamphetamine again even after treatment. Father also did not know how long it would take to find somewhere to live once he got out of treatment. However, Father felt that he could be successful with reintegration because he would never give up on his family.

*Mother*

Mother testified that she had been incarcerated at the Douglas County Jail since November 2014 and that she was still incarcerated at the time of the termination hearing because she had absconded from work release. Mother stated that she was in custody on a municipal case until August 15, 2015; was on probation for a Douglas County District Court case; and had a six-count felony case pending in Shawnee County. Mother testified that she intended to continue her relationship with Father and understood that any drug

9

use by Father would negatively affect her ability to reintegrate with E.M. and C.C. Mother acknowledged that she needed to complete inpatient treatment before she would be in a position to parent the children and claimed that she had considered some potential inpatient facilities. Mother stated that she had participated in a reintegration-type program during her incarceration and had participated in NA at the Douglas County Jail.

At the end of the hearing, the district court terminated Mother's parental rights to E.M. and C.C. and Father's parental rights to E.M. Mother and Father timely appeal.

## DID SUFFICIENT EVIDENCE EXIST TO SUPPORT THE DISTRICT COURT'S DECISION TO TERMINATE MOTHER'S AND FATHER'S PARENTAL RIGHTS?

On appeal, Mother and Father argue there was insufficient evidence in the record to support the district court's ruling terminating their parental rights. Specifically, they contend that there was insufficient evidence to support the district court's findings that they were unfit, that their unfitness was unlikely to change in the foreseeable future, and that termination of their parental rights was in the children's best interests.

In reviewing a district court's decision terminating parental rights, an appellate court must consider "whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that [the parent's rights should be terminated.]" *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). Clear and convincing evidence is "an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt." 286 Kan. at 691. Appellate courts do not reweigh the evidence, judge the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705.

In order for the district court to terminate parental rights, the State must prove by clear and convincing evidence that (1) the parent is unfit and (2) the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future. K.S.A. 2014 Supp. 38-2269(a). The State also must prove, albeit only by a preponderance of the evidence, that termination is in the best interests of the child. K.S.A. 2014 Supp. 38-2269(g)(1); see *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014).

K.S.A. 2014 Supp. 38-2269(b) and (c) provide a nonexclusive list of factors that the court must consider when determining parental unfitness. The existence of any one of these statutory factors "standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 2014 Supp. 38-2269(f).

In the present case, the district court relied on the following statutory factors in deciding that Mother and Father were unfit:

- K.S.A. 2014 Supp. 38-2269(b)(3) (use of liquor or drugs that renders the parent incapable of caring for child);
- K.S.A. 2014 Supp. 38-2269(b)(7) (failure of social service agency efforts to rehabilitate the family);
- K.S.A. 2014 Supp. 38-2269(b)(8) (lack of effort by the parent to adjust his or her circumstances to meet the needs of the child);
- K.S.A. 2014 Supp. 38-2269(c)(3) (failure of the parent to carry out a reasonable court-approved plan to return the child to the parent's home).

*Mother's unfitness*

Mother challenges the district court's findings that she is unfit, primarily relying on the case plan tasks that she did complete both prior to and during her incarceration, the steps she took to address her drug addiction issues, and the positive nature of her

11

interactions with E.M. and C.C. during visits. Mother also takes issue with KVC's efforts to effect reintegration. Father does not challenge the district court's finding that he is unfit.

Despite Mother's participation in NA while in jail and her inquiries into inpatient treatment programs, there is overwhelming evidence that she has continually struggled to maintain her sobriety, as evidenced by her continued drug use, multiple positive UAs, and failure to show up for required testing. Among the factors the district court cited, it also found that even prior to her incarceration, Mother did not avail herself of the numerous services offered to help her participate in case planning and facilitate reintegration, and the record is replete with uncompleted case plan tasks or requirements that had been communicated to Mother. Although Mother complains that KVC did not make reasonable efforts to achieve reintegration, these claims are contrary to the testimony presented by the family's KVC case workers.

The record reflects that Mother made some efforts to complete case plan tasks prior to, and during, her incarceration. Despite these efforts, however, there is still clear and convincing evidence to support the district court's finding that Mother is unfit.

*Unfitness unlikely to change in the foreseeable future*

Both Father and Mother argue the evidence was insufficient to support the court's finding that the conduct or condition rendering them unfit is unlikely to change in the foreseeable future.

In determining whether there is clear and convincing evidence to support the district court's finding that the conduct or condition rendering Mother and Father unfit is unlikely to change in the foreseeable future, we consider whether a condition is likely to change in the foreseeable future from the perspective of the child and not the parent. See,

12

*e.g.*, *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re C.C.*, 29 Kan. App. 2d 950, Syl. ¶ 2, 34 P.3d 462 (2001). Consequently, efforts at rehabilitation or reintegration must proceed promptly to a successful conclusion. *In re D.T.*, 30 Kan. App. 2d 1172, 1175, 56 P.3d 840 (2002). Parental unfitness can be judicially predicted from a parent's past history. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

Considering Mother's and Father's history, there is sufficient evidence to support the district court's finding that neither parent's unfitness is likely to change in the foreseeable future. Prior to the current DCF investigation, Mother and Father were the subjects of at least three previous investigations: (1) In September 2011, E.M. was seen eating marijuana; (2) in May 2012, it was reported that Mother and Father were using drugs, that the children were not being supervised, and that their home was dirty; and (3) in September 2013, unsafe living conditions were reported, along with drug use by Mother.  E.M. and C.C. had been in state custody since January 2014 as a result of the current DCF investigation. As noted by the district court, neither Mother nor Father had made any significant effort to address their drug addictions in the 14 months between the children's removal from their care and the termination hearing. Indeed, Father submitted positive UAs, failed to show up for required testing, admitted to using methamphetamine weekly, and stated that he had last used the drug approximately a week prior to the hearing. Mother also submitted positive UAs and failed to show up for required testing prior to her incarceration. Luedtke testified that Father and Mother would need to achieve 6 months of sobriety before she would consider reintegration.

Father suggests that the district court should have granted him additional time to complete his case plan tasks because E.M. had not actually been in an out-of-home placement for a significant amount of time under the definition of "'[e]xtended out of home placement'" set forth in K.S.A. 2014 Supp. 38-2202(i). But Father's argument is misplaced. Extended out-of-home placement findings are only relevant with respect to a district court's unfitness determination under K.S.A. 2014 Supp. 38-2269(b)(9) that a

13

child has been in extended out of home placement as a result of the parent's actions or inactions. Here, the district court made no findings under K.S.A. 2014 Supp. 38-2269(b)(9). Although Father rightfully notes the progress he made in completing some case plan tasks shortly before the termination hearing, the record reflects that in addition to Father's failure to adequately address his substance abuse issues, he had not achieved any sort of stability with respect to housing or employment and appeared to become serious about completing case plan tasks only when a court date was approaching.

Additionally, Mother was to be incarcerated for at least 5 more months after the termination hearing and had additional felony charges pending. Although Mother claimed she planned to request a sentence modification so she could participate in treatment and would therefore be in a position to parent the children in "a few months," this court has held that incarceration can be used as a factor to support a finding that a parent's condition would not change in the foreseeable future. See *In re M.B.*, 39 Kan. App. 2d at 47-48 (finding that incarceration for as few as 7 additional months from the date of the hearing, along with other factors, was sufficient to establish that the parent's condition would not change in the foreseeable future). Significantly, Mother would still need to show 6 months of sobriety following her incarceration before the reintegration process could begin. In addition, Mother has no history of maintaining stable employment or housing.

At the time of the hearing, E.M. and C.C. had been in state custody for more than 14 months. The district court was justified in finding that any additional time was more than the State or the parents should ask of these children. There is clear and convincing evidence that the conduct or condition rendering Mother and Father unfit is unlikely to change in the foreseeable future.

*Best interests*

Finally, we must consider whether the district court correctly determined that terminating Mother's and Father's parental rights was in the children's best interests. Because the district court hears the evidence directly, it is in the best position to determine the best interests of a child, and an appellate court cannot overturn it without finding an abuse of discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255, *rev. denied* October 7, 2010. An abuse of discretion occurs when the district court acts in an unreasonable, fanciful, or arbitrary manner or when the court bases its decision on an error of fact or an error of law. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106, *cert. denied* 134 S. Ct. 162 (2013). In considering termination, we are to give primary consideration to the child's physical, mental, and emotional needs. K.S.A. 2014 Supp. 38-2269(g)(1).

Here, the district court found that the children's best interests would best be served by terminating Mother's and Father's parental rights. Specifically, the court noted that E.M. and C.C. had

> "spent a significant portion of their young lives in foster care. These children require permanency and deserve to know who will be raising them and they deserve to be raised in a [stable] and safe environment. These biological parents have not provided those basic needs to these children and are not in a position to do so in the foreseeable future."

Mother and Father argue the record is insufficient to support a finding that termination of their parental rights was in E.M.'s and C.C.'s best interests. Specifically, Mother claims the district court's ruling was in error because the court used the parental unfitness findings to support its finding that termination was in the children's best interests and there was no evidence presented from a therapist or social worker to show what effect termination would have on the children. Father contends the court erred in

15

making a best-interests finding by failing to consider evidence of his consistent visitation and his close bond with E.M.

Mother's argument that the district court used the parental unfitness findings to support its finding that termination was in the children's best interests is without merit. The court's written findings specifically set out the statutory bases for its conclusion that Mother and Father are unfit. The court then set out specific reasons detailing why termination of their parental rights is in the children's best interests, considering their physical, mental, and emotional health. Given the evidence before the district court, testimony from a therapist or social worker to show what effect termination would have on E.M. and C.C. is not necessary to make a best-interests finding. The family had been the subject of multiple DCF investigations. Additionally, the court heard evidence that the children were taken into state custody in January 2014 after they were discovered in a motel room with drugs and drug paraphernalia nearby. Since that time, the State attempted to work with the parents through multiple case plan tasks, but they were unable to follow through consistently. Both Mother and Father have a history of drug issues that they have yet to address in any meaningful way, and neither of them were able to show that they could maintain stable employment or housing. At the time of the termination hearing, Mother was to be incarcerated for at least 5 more months and was facing additional felony charges.

As to Father's objections, there is nothing in the record to suggest that the district court did not consider Father's bond with E.M. in making its decision. The bond between a child and a parent is but one factor a court may consider in ruling on a motion to terminate parental rights. Despite the existence of such a bond, however, it cannot be said that termination of Father's parental rights was not in E.M.'s best interests. Mother and Father had more than 14 months to sufficiently make the changes that could have resulted in the children's reintegration into their home. A reasonable person could agree with the district court's best-interests decision, and there is no indication that the decision was

16

based on any error of fact or law. As a result, the district court did not abuse its discretion when it concluded that terminating Mother's and Father's parental rights was in the best interests of E.M. and C.C.

Affirmed.