NOT DESIGNATED FOR PUBLICATION

Nos. 120,107
120,108

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of H.E. and E.E.,
Minor Children.

MEMORANDUM OPINION

Appeal from Douglas District Court; PEGGY C. KITTEL, judge. Opinion filed April 5, 2019.
Affirmed.

*Jennifer K. Wika*, of Lawrence, for appellant natural mother.

*Kate Duncan Butler*, assistant district attorney, and *Charles E. Branson*, district attorney, for
appellee.

Before GARDNER, P.J., ATCHESON and SCHROEDER, JJ.

PER CURIAM: Mother appeals the termination of her parental rights to her two
children, H.E., born in 2015, and E.E., born in 2016. She argues the evidence was
insufficient to show she was an unfit parent or that her children's best interests would be
served by terminating her parental rights. After reviewing the entire record, we disagree
and affirm the district court.

*Factual and Procedural History*

In September 2016, Mother took E.E. to Lawrence Memorial Hospital because
E.E. was having seizures. E.E. was later flown to Children's Mercy Hospital because of

1

brain trauma and several rib fractures. One of those fractures had likely occurred 7-10 days earlier.

Father admitted to police he had shaken E.E. out of frustration earlier that day. He also said he had seen Mother throw E.E. into her infant chair two days before, after which Mother started yelling, hitting, and punching things. Mother said she did not know how E.E. got the older rib fracture and denied causing it.

That same month, the State petitioned to have H.E. and E.E. declared children in need of care, and the district court placed H.E. and E.E. in the temporary custody of the Department for Children and Families (DCF). Social service agencies and caseworkers developed a plan that would allow Mother to regain custody of H.E. and E.E. and reintegrate with them as a family. But efforts to rehabilitate the family ultimately failed, and the State moved to terminate Mother's parental rights.

The district court held a termination hearing in February 2018. The following evidence was presented at the hearing:

• Mother testified she did not take E.E. to the hospital right after her first seizure. She waited until E.E. had a second seizure that same evening, and then called Father, who was at work at Taco Bell. She took E.E. to Father's work and left her there while she went to the store to get prune juice. Mother said the prune juice was for E.E.'s constipation, even though she did not think the constipation was causing E.E.'s seizures. While E.E. was with Father, she had another seizure. Mother then finally took E.E. to the hospital several hours after the first seizure.

• E.E. was still recovering from her injuries at the time of the hearing and required regular visits with several specialists and therapists. She no longer used a feeding tube, and her seizures had stopped, though her foster family carried

2

seizure medication with them just in case. Because of her brain injuries, she would likely have a permanent shunt. Doctors had recommended that her caretaker undergo intensive training offered by the hospital to address all her medical needs.

• When H.E. went into DCF custody, he was developmentally delayed. Despite being over a year old, he did not have the muscles to stand up on his own and knew no words. He was receiving speech therapy at the time of the hearing.

• While Mother had made it to almost all her weekly one-hour supervised visits, she had never been able to move to unsupervised visits. Caseworkers had concerns about leaving the children alone with Mother because she had not shown she could supervise or care for them both at the same time.

• As part of her case plan, Mother had participated in a parenting and psychological evaluation. The evaluation revealed she had borderline delayed intelligence with the verbal skills of an eight year old. She also had a language disorder, unspecified impulse control disorder, and generalized anxiety disorder. The evaluator recommended that Mother attend anger management classes, budget training, and one-on-one parenting training.

• Mother gave conflicting statements to her evaluator. For example, she said several times that her children were too heavy for her because she was only 4'8", and she could not carry or manage them on her own. She claimed this was one of the reasons she did not take E.E. to the hospital right after E.E. began having seizures. But she also said she had no trouble carrying her nieces and nephews, who were older and bigger than H.E. and E.E.

• Over the course of the case, Mother had moved to Leonardville to live with her boyfriend at the time. Caseworkers could not complete a background

3

check on Mother's boyfriend because she did not return the necessary forms. Before caseworkers could do an inspection, she moved in with her father in Lawrence a couple months before the hearing. She planned to reintegrate her children there, but caseworkers had yet to do a walkthrough.

• Mother said she had been working full-time as a manager for Burger King for a couple months, but caseworkers had not received proof of employment. Mother had one meeting with caseworkers for budget training but could not complete the training because she did not turn in the necessary paperwork.

In a journal entry, the district court found by clear and convincing evidence that Mother was statutorily unfit because

- she suffered from a mental deficiency that rendered her unable to safely care for the children under K.S.A. 2018 Supp. 38-2269(b)(1);
- she had abused or neglected E.E. under K.S.A. 2018 Supp. 38-2269(b)(2) and (b)(4);
- reasonable efforts by the involved social service agencies had been unable to rehabilitate the family under K.S.A. 2018 Supp. 23-2269(b)(7); and
- she had not made a significant effort to adjust her conditions to meet the needs of the children under K.S.A. 2018 Supp. 38-2269(b)(8).

The court also found Mother's conditions were unlikely to change in the foreseeable future. And the court held H.E.'s and E.E.'s best interests would be served by terminating Mother's parental rights. Mother appeals.

4

*Analysis*

A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the inherent importance and unique character of that relationship, the right has been deemed fundamental. For this reason, the State may extinguish the legal bonds between parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2018 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

As provided in K.S.A. 2018 Supp. 38-2269(a), the State must prove the parent to be unfit "by reason of conduct or condition" making him or her "unable to care properly for a child" and that the circumstances are "unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine conditions that singularly or in combination would amount to unfitness. K.S.A. 2018 Supp. 38-2269(b). And the statute lists four other factors to be considered if a parent no longer has physical custody of a child. K.S.A. 2018 Supp. 38-2269(c).

In reviewing a district court's determination of unfitness, an appellate court must be convinced, based on the full evidentiary record considered in a light favoring the State as the prevailing party, that a rational fact-finder could have found that decision "highly probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at 705. The appellate court cannot weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705. In sum, we must resolve any conflicts in evidence to the State's benefit and against Mother.

Having found unfitness, the district court must then decide whether termination of parental rights is "in the best interests of the child." K.S.A. 2018 Supp. 38-2269(g)(1). As

directed by the language of K.S.A. 2018 Supp. 38-2269(g)(1), the district court gives "primary consideration to the physical, mental and emotional health of the child." The district court makes that determination based on a preponderance of the evidence. See *In re R.S.*, 50 Kan. App. 2d at 1116. The best-interests issue is essentially entrusted to the district court acting within its sound judicial discretion. 50 Kan. App. 2d at 1115-16. An appellate court reviews those sorts of decisions for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

The district court found Mother to be unfit based on five statutory grounds set forth in K.S.A. 2018 Supp. 38-2269(b)(1), (b)(2), (b)(4), (b)(7), and (b)(8). As for K.S.A. 2018 Supp. 38-2269(b)(1), the evidence shows Mother had a mental deficiency that made her unable to care for H.E. and E.E. In addition to Mother's listed diagnoses, her evaluator opined Mother's low intelligence likely contributed to the removal of the children because Mother did not know what to do in a medical emergency. The evaluator believed that Mother would have trouble caring for a medically fragile child such as E.E. because Mother could not understand doctors' instructions. Likewise, the evaluator believed Mother could not complete the necessary medical training to take care of E.E. Mother also had poor judgment and trouble controlling her impulses, which put the children at risk.

As for K.S.A. 2018 Supp. 38-2269(b)(2) and (b)(4), the evidence shows Mother either neglected or abused the children. Mother testified that when she saw Father shaking E.E., she took E.E. from him but did not say anything about the incident. When E.E. began having seizures in Mother's care, Mother delayed taking her to the hospital for several hours. Mother also reported she sometimes left H.E. alone when she went to pick

6

up Father from work in the early morning hours. She defended this behavior, saying the door was locked and nothing bad could happen to him. Father also told police that Mother had once thrown E.E. into an infant chair. And Mother claimed that doctors were lying that E.E. had multiple rib fractures.

As for K.S.A. 2018 Supp. 38-2269(b)(7), Mother did meet monthly with caseworkers, regularly attended visits with her children, and completed a parenting and psychological assessment. But she did not complete an anger management class, even though caseworkers gave her information on one. Nor did she complete budget training. Caseworkers could not find a resource providing one-on-one parenting training for young children. One caseworker explained that the agency's parenting training classes focus more on discipline and relationship building, not skills like "how to safety proof a room for small children." And while caseworkers did not have concerns about substance abuse, Mother was still on the UA call-in schedule because she had not been compliant in calling in to check if she had a UA scheduled.

Mother argues that social service agencies and caseworkers did not make reasonable efforts to rehabilitate the family, noting they did not provide her with any services to improve her parenting skills. But as the State notes, the appropriate agencies need not make herculean efforts to help parents through the reintegration plan. See *In re M.E.*, No. 113,482, 2015 WL 7693669, at * 7 (Kan. App. 2015) (unpublished opinion). Caseworkers tried to help Mother complete anger management classes and budget training, but she did not take advantage of these resources. And while caseworkers were unable to find parenting training to address Mother's specific problems, caseworkers did give her feedback during supervised visits.

Many of the same facts supporting the fourth statutory ground supports K.S.A. 2018 Supp. 38-2269(b)(8), lack of effort to change. Mother claimed she had completed an anger management class and a parenting class on her own, but she had provided no

7

documentation of completion. And despite her failure to complete all her case plan tasks, Mother felt she could parent her children safely and the only help she would need is learning how to budget and how to attend to E.E.'s medical needs. She also told her evaluator that her parenting skills were sufficient, and she needed no training. Caseworkers reported that Mother responded well to feedback on her parenting, but she often failed to make lasting changes to her behavior. Based on this evidence, a rational fact-finder could have found Mother was unfit to parent H.E. and E.E. at the time of the termination hearing.

Mother argues the district court erred in terminating her parental rights because she substantially complied with the reintegration plan. For support, she cites *In re A.M.*, No. 116,391, 2017 WL 2022704 (Kan. App. 2017) (unpublished opinion), in which we reversed the termination of the father's parental rights, distinguishing between a chronically unfit parent and a parent who is below average. Comparing herself to the father in *A.M.*, she argues she is not chronically unfit because she substantially complied with the case plan tasks.

In *A.M.*, this court reversed the district court's ruling because the father "was neither negligent nor malicious in his parenting . . . [and h]e had no pernicious condition or characteristics that rendered him statutorily unfit." 2017 WL 2022704, at *6. But this is not so in Mother's case. The evidence shows Mother's behavior was at least negligent, if not abusive. And her condition is pernicious, because her inability to supervise and care for her small children puts them at risk of harm.

Likewise, the evidence shows Mother's unfitness was unlikely to change in the foreseeable future. In gauging the foreseeable future, the courts should use "child time" as the measure. As the Revised Kansas Code for Care of Children, K.S.A. 2018 Supp. 38-2201 et seq., recognizes, children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that different

perception typically points toward a prompt, permanent disposition. K.S.A. 2018 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings "in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's").

Both H.E. and E.E. were under three years old at the time of the termination hearing, meaning they had both spent over half their lives in State custody. And in this period, Mother had not made substantial progress to reintegrate with them. One caseworker believed Mother could not be made fit within a reasonable amount of time. Other providers believed that no level of services existed that could enable Mother to reintegrate with her children. Based on her behavior and attitude, Mother appeared unlikely to make the changes necessary to reintegrate with her children within the foreseeable future.

Finally, the district court did not abuse its discretion by finding H.E.'s and E.E.'s best interests would be served by terminating Mother's parental rights. Mother testified that she loved her children, and no one disputed this. But some service providers questioned the strength of her bond to the children. And they all agreed Mother was unable to safely care for both children simultaneously and was unlikely to be able to do so in the near future. For these reasons, a reasonable district court could agree that termination of Mother's parental rights would best serve H.E.'s and E.E.'s physical, mental, and emotional health.

Affirmed.