NOT DESIGNATED FOR PUBLICATION

No. 117,605

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of K.G., J.G., and T.G.,
Minor Children.

MEMORANDUM OPINION

Appeal from Harvey District Court; MARILYN M. WILDER, judge. Opinion filed November 9, 2017. Affirmed.

*Gregory C. Nye,* of Nye & Nye, of Newton, for appellant natural father.

*Kaitlin M. Dixon,* assistant county attorney, and *Joseph L. Uhlman*, legal intern, for appellee.

Before STANDRIDGE, P.J., PIERRON and ATCHESON, JJ.

PER CURIAM:  Father appeals from the termination of parental rights to his children, K.G., J.G., and T.G. Specifically, Father claims the State failed to present clear and convincing evidence that he is unfit, that his condition is unlikely to change in the foreseeable future, and that his parental rights should be terminated. Father also claims there is insufficient evidence to trigger the statutory presumption that he is unfit. We have reviewed the entire record in this case and find clear and convincing evidence to support the district court's decision to terminate Father's parental rights. We therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Father's children first came to the attention of the Kansas Department for Children and Families (DCF) on July 30, 2015. On that day, local police officers reported to DCF that they had discovered Mother passed out in her van with her and Father's two youngest

1

children, J.G. (age 9) and T.G. (age 3 months), in the vehicle. The van was located in a store parking lot. The officers believed Mother was under the influence of drugs because she was extremely difficult to awaken and took considerable time to focus on her situation.

After receiving the report, DCF workers attempted to locate Mother and the children at various addresses. DCF workers ultimately were able to make contact with Father at the family home. Father said he had no idea where his children were, reporting that Mother had left with the children several days earlier. Father also told DCF workers that Mother was using methamphetamine.

Later that day, a DCF worker was able to find the oldest child, K.G. (age 14), at her maternal grandmother's home. While interviewing K.G., the teen reported that Father had yanked hair out of her head two weeks earlier during an argument. The DCF worker noted that the missing hair was obvious from K.G.'s scalp. K.G. also reported there was on-going domestic violence in their home between Father and Mother.

Shortly after talking with K.G., Mother arrived in a van at the grandmother's house with J.G. and T.G. When asked, Mother reported that she was living in a tent at a nearby lake with a friend. The DCF worker asked Mother to complete a safety plan with DCF to allow the children to stay with the grandmother while DCF assessed the family's circumstances. Mother got angry in response to the worker's request and threw a full baby bottle at the general area where grandmother, who was holding T.G., was situated. At this point, the DCF worker called for police assistance.

The State ultimately filed an ex parte motion seeking protective custody of the three children, which was granted by the court the same day it was filed. Shortly thereafter, the court entered an order granting DCF temporary custody of the children. DCF placed the children in the home of their maternal grandparents.

Saint Francis Community Services (SFCS) was assigned to supervise efforts to reintegrate the children with their parents. When the children were removed from the home, the two older children provided SFCS additional information. K.G. and J.G. both reported that there was on-going domestic violence in the home and that Father repeatedly verbally and physically abused Mother. K.G. also told DCF employees that both Mother and Father used methamphetamine and that K.G. was the person primarily responsible for looking after the younger children. K.G. noted the family moved frequently because Father would get fired from his job and they would get evicted from their home.

At a subsequent adjudication hearing, Father and Mother stipulated that the children qualified as children in need of care (CINC) and the court ordered the children to remain in out-of-home placement. At the time of adjudication, K.G. was 14 years old, J.G. was 10 years old and T.G. was less than a year old.

The first case plan meeting was held in August 2015. Both parents attended. After this meeting, a written permanency plan setting forth specific tasks designed to achieve the goal of reintegration was prepared by SFCS and adopted by the court. In order to comply with the plan for reintegration, Father was required to successfully complete the following tasks: (1) report any contact with law enforcement to SFCS within 24 hours of occurrence; (2) obtain a drug and alcohol evaluation and follow any recommendations until successfully discharged; (3) refrain from abusing drugs or alcohol throughout the duration of the case and submit to random tests to verify compliance; (4) find and maintain employment and provide proof of such employment; (5) obtain safe and appropriate housing for the family, provide proof of such housing, and show no disruption in utility services or threat of eviction for a period of at least six months; (6) complete a parenting class and demonstrate skills learned during visitation with the children; (7) complete a psychological evaluation and follow any mental health treatment recommended; (8) complete a domestic violence class; and (9) complete an anger

3

management assessment and follow all recommendations made as a result of the assessment. In July 2016, Father's permanency plan was amended to include successful completion of a budgeting class and a requirement for Father and Mother to engage in marital counseling.

Father's permanency plan for all three children focused solely on reintegration from the time it was prepared in September 2015 until August 2016. At this one-year point, a permanency goal of adoption was added as an alternative option for the children. At a permanency hearing in January 2017, the district court concluded Father had failed to make sufficient progress in completing the tasks assigned in the permanency plan; thus, reintegration with him was no longer a viable option for the children. The court directed the county attorney to file a motion to terminate Father's parental rights.

The motion to terminate parental rights was filed by the State on February 7, 2017. At a two-day trial held at the end of March, the district court heard evidence—including Father's testimony—and reviewed SFCS records and other documentary evidence. After closing argument by counsel, the district court determined the State presented clear and convincing evidence, as required by K.S.A. 2016 Supp. 38-2269(a) and (g)(1), to establish that Father was unfit by reason of conduct or condition which rendered him unable to care properly for his children, the conduct or condition was unlikely to change in the foreseeable future, and termination of parental rights was in the best interests of the children.

ANALYSIS

The district court may terminate a parent's rights when the State has shown (1) that the parent is unfit and likely will remain so for the foreseeable future and (2) that it is in the best interests of the child to terminate the parent's rights. See K.S.A. 2016 Supp. 38-2269(a), (g)(1). Notably, a parent's rights may be terminated only when the evidence

4

supporting termination is especially strong: under the statute, the evidence must be "clear and convincing." K.S.A. 2016 Supp. 38-2269(a). To be clear and convincing, the facts must be highly probable. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

We review a district court's decision to terminate a parent's rights by asking whether a rational fact-finder could have found it highly probable that the parent's rights should be terminated. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). Because the district court—which is charged with finding the facts—terminated Father's parental rights, we review the evidence in the light most favorable to that determination. 50 Kan. App. 2d at 1170; *In re K.W.*, 45 Kan. App. 2d 353, Syl. ¶ 1, 246 P.3d 1021 (2011). Further, in reviewing the district court's decision, we may not reweigh the evidence, judge the credibility of witnesses, or redetermine factual questions. *In re B.D.-Y.*, 286 Kan. at 705; *In re M.H.*, 50 Kan. App. 2d at 1170.

On appeal, Father argues that the district court lacked sufficient evidence to conclude that he was presently unfit to parent the children and that his unfitness was unlikely to change in the foreseeable future.

1. *Unfitness*

The district court may base its finding of unfitness on one of several considerations outlined by the Legislature. See K.S.A. 2016 Supp. 38-2269(a)-(c). If supported by clear and convincing evidence, a single statutory basis for unfitness can support terminating a parent's rights, though courts should consider all applicable factors. K.S.A. 2016 Supp. 38-2269(f); *In re M.H.*, 50 Kan. App. 2d at 1170. Here, the district court relied on five of these statutory factors to support its finding that Father was unfit:

1. Father suffered from an emotional illness, mental illness, mental deficiency, or physical disability of such duration or nature as to render him unable to care

for the ongoing physical, mental, and emotional needs of his children, K.S.A. 2016 Supp. 38-2269(b)(1);

2. Father's use of intoxicating liquors or narcotic or dangerous drugs was of such duration or nature as to render him unable to care for the ongoing physical, mental, or emotional needs of his children, K.S.A. 2016 Supp. 38-2269(b)(3);

3. Reintegration failed, notwithstanding the fact that public and private agencies exercised reasonable efforts to get the family back together, K.S.A. 2016 Supp. 38-2269(b)(7);

4. Father exhibited a lack of effort to adjust his circumstances, conduct, or conditions to meet the children's needs, K.S.A. 2016 Supp. 38-2269(b)(8); and

5. Father failed to carry out a reasonable, court-approved plan directed toward reintegrating the children into his home, K.S.A. 2016 Supp. 38-2269(c)(3).

Father's argument on appeal primarily addresses the last three factors set forth above. Because carrying out a reasonable plan directed toward reintegration necessarily requires both the agency and the parent to put forth significant effort, we focus our discussion on Father's compliance with the terms and conditions of the reintegration plan.

The reintegration plan required Father to obtain a drug and alcohol evaluation and then follow any recommendations until successfully discharged. Although Father completed a drug and alcohol assessment as required by the plan, he never followed through on its recommendation that he participate in outpatient substance abuse treatment, which was also required by the plan. The court determined that Father's participation in the support group named Celebrate Recovery did not qualify as outpatient treatment and, even if it did, Father had only completed one-half of the 12-step program in the 20 months the reintegration plan had been in place; it had taken Father about 9 months to reach the halfway mark in the program.

6

The reintegration plan required Father to find and maintain employment and provide proof of such employment. But Father failed to provide pay stubs to show he was consistently employed. Father alleges his failure to provide pay stubs was insignificant. However, the paystubs would establish not only stability in his employment but the amount of his earnings and the number of hours he was working. In light of the concerns about unstable housing, his claims that financial burdens were preventing him from obtaining treatment, and other concerns related to the reintegration plan, the failure by Father to provide the pay stubs was a significant component of the reintegration plan.

The reintegration plan also required Father to obtain safe and appropriate housing for the family, provide proof of such housing, and show no disruption in utility services or threat of eviction for a period of at least six months. This never occurred. At the time of the original plan in August 2015, Father was renting and living in a house on Fourth Street in Newton. In November 2015, the water to the house had been shut off, although it was later reinstated. The landlord sent Father and Mother a notice of eviction in late 2015 or early 2016 because he was $2,400 behind on the rent. The parents were not evicted on that particular occasion because a relative paid the amount past due. At one point thereafter, however, SFCS discovered at a home visit that the electricity had been shut off. Father and Mother subsequently were evicted from the Newton home, again apparently for unpaid rent. They were homeless for several weeks living out of their car and/or camping at a nearby lake. Over the next several months, Father and Mother lived in a charity shelter and then with an aunt. Father and Mother did not rent another residence until November 2016. It was a two-bedroom trailer, which needed numerous repairs as listed by SFCS personnel in the initial home inspection. Father complains that SFCS never returned to inspect the home after the repairs were made. According to a witness testifying on Father's behalf at trial, however, the repairs were not completed until a few days before the State filed its motion to terminate parental rights.

The August 2015 reintegration plan also required Father to obtain a psychological examination and follow its recommendations, but Father did not complete this evaluation until July 2016, nearly a year later. When he was assessed, Father was diagnosed with persistent depressive disorder, a generalized anxiety disorder, and a personality disorder with borderline and paranoid features. He also exhibited problems regulating his anger and other emotions. This diagnosis and prognosis were similar to that given to Father by another psychologist he visited prior to the initiation of the CINC proceeding. Based upon the 2016 assessment, the psychologist recommended that Father participate in individual therapy to address his personal issues, to engage in family therapy, and to resume appointments for medication management. The examining psychologist did not believe Father was likely to get better without therapy and/or medication.

Father does not dispute that he failed to participate in mental health treatment or a medication management program. Although Father argues his failure to seek mental health treatment was due to a lack of adequate finances, the record reflects SFCS recommended various places where Father could receive individual therapy at a reduced cost. Father testified that he attempted to obtain mental health treatment from Prairie View, a certified therapy center. Father said he scheduled several appointments but ultimately was unable to attend the scheduled appointments because of his work schedule. As a result of his missing scheduled appointments, Father testified Prairie View directed him to make appointments by calling the "same-day" scheduling. Under this scheduling procedure, Father was instructed to call in the morning of any day when he was available; Prairie View would then see if the therapist had time in his or her schedule to see Father that day. Father testified that he was never able to obtain an appointment with Prairie View when he called under this procedure. Father admitted, however, that he had not made any recent efforts to schedule an appointment.

Although Father puts the blame on Prairie View for his difficulties in obtaining mental health treatment, it does not explain his delay in obtaining the mental evaluation.

8

In addition, the problem with the same-day calling policy was a direct result of Father missing scheduled appointments. Father says he missed the appointments because he had to work, but the record reflects that Father only worked part-time during most of the time the plan was in effect. And Father conceded he stopped all efforts to schedule therapy after he was told to utilize the same-day schedule. Finally, there was no evidence that Father was medication compliant or was attempting to get assistance in managing his medications, as required by the plan.

A supplement to the reintegration plan required Father to successfully complete a budgeting class. Father claims he completed a budgeting class shortly before trial. But the record shows Father participated in a budgeting "review" with a credit counseling service. Although Father generally testified that the results of the budget review reflected he would have a surplus of $2 left over every month, Father failed to explain whether the budget reviewed by the credit counselor included the cost of extra food, clothing, and supplies needed if the children returned to the home. Most significantly, Father's testimony failed to establish that the review included any meaningful training on how to create and comply with a budget.

Father's reintegration plan was amended to require Father and Mother engage in marital counseling. Father and Mother attended couples counseling from the middle of March to the end of April 2016. Pastor John Branson of a local church in Florence provided the counseling; Branson had been in the ministry since 1992 and possessed a college degree and completed some master's work. Pastor Branson is Father's second cousin but Father only met him for the first time at the end of 2014. In late 2015, Father approached Pastor Branson about couples counseling. Father obtained SFCS approval to use Pastor Branson as their couples' counselor. Pastor Branson had conducted marriage counseling about five times previously. Father, Mother, and Pastor Branson spent eight weeks looking at different qualities of life and marriage during weekly sessions. The last session occurred on April 16, 2016. According to Pastor Branson, the parents completed

9

all levels of the program smoothly and attended all the sessions. The pastor stayed in touch with the SFCS caseworker and kept him updated on their progress.

But the court found Father did not meaningfully participate in marital counseling as required by the reintegration plan. Specifically, Pastor Branson testified at trial that Father and Mother did not disclose incidents of domestic violence in the past between them. In addition, Pastor Branson testified that he understood when Father and Mother started counseling that they both had stopped methamphetamine and illegal drug usage. Pastor Branson was not aware that Mother tested positive for marijuana several times in April and May 2016.

Based on the evidence presented as described above, we conclude the State met its burden to prove by clear and convincing evidence that reintegration failed, notwithstanding the fact that public and private agencies exercised reasonable efforts to get the family back together because Father failed to carry out a reasonable, court-approved plan directed toward reintegrating the children back into his home due to a lack of effort to adjust his circumstances, conduct, or conditions to meet the children's needs. K.S.A. 2016 Supp. 38-2269(b)(3), (b)(7), and (c)(3). Accordingly, we affirm the court's finding that Father was unfit under K.S.A. 2016 Supp. 38-2269(a).

Because we have found clear and convincing evidence in the record to support the district court's finding that Father is unfit under K.S.A. 2016 Supp. 38-2269(b)(3), (b)(7), and (c)(3), we need not address Father's assertion of insufficient evidence to support the district court's findings of unfitness under K.S.A. 2016 Supp. 38-2269(b)(1) or his assertion that the district court erred in finding Father presumptively unfit under K.S.A. 2016 Supp. 38-2271(a)(5).

2. *Unfitness unlikely to change in the foreseeable future*

Separate and apart from the district court's decision that he was unfit at the time of the hearing, Father claims the State failed to prove by clear and convincing evidence that he would be unfit and unable to care for his children in the foreseeable future, as required by K.S.A. 2016 Supp. 38-2269(a). In support of his claim, Father argues that he could have come into compliance with the plan in a short period of time if given the chance. But Father's argument is not supported by the evidence. Even assuming the used trailer home had been repaired as requested by SFCS, it would take some time for the family to transition back to monitored supervision to placement in the home. Likewise, Father still had failed to obtain mental health therapy or medication management to address his persistent depressive and emotional instability. He had been at his current employer for only about four months and appeared to be working, at best, 20 hours per week. Father's history of frequent job changes establishes a pattern of instability in work and housing, and there is no evidence suggesting a break in this pattern. Finally, it would be reasonable to infer that Father needed at least another nine months to complete the Celebrate Recovery's 12-step program because he had completed only half of the steps. The foreseeable future in CINC proceedings is viewed from a child's perspective because a child's perception of time differs from that of an adult. K.S.A. 2016 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008). While the two older children were 14 and 9 years of age when the case started, T.G. was only 3 months old. The older children had no confidence in their parents' ability to stay sober and create a stable home; T.G. had been in the out-of-home placement for nearly his entire life.

Based on the discussion above, we conclude the district court did not err in terminating Father's parental rights.

Affirmed.

11