NOT DESIGNATED FOR PUBLICATION

Nos. 123,615
123,616
123,617

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of S.A., P.A., and G.A.,
Minor Children.

MEMORANDUM OPINION

Appeal from Washington District Court; KIM W. CUDNEY, judge. Opinion filed September 17,
2021. Affirmed.

*Chantz N. Martin*, of Fraiser, Johnson & Martin, LLC, of Beloit, for appellant natural father.

*Starla L. Borg Nelson*, of Navis & Nelson, LLC, of Belleville, and *Elizabeth Baskerville Hiltgen*,
county attorney, for appellee.

Before BUSER, P.J., POWELL and HURST, JJ.

PER CURIAM: This is an appeal by Father of the district court's order terminating
his parental rights to S.A., P.A., and G.A. The district court also terminated Mother's
parental rights but that is the subject of a separate appeal.

FACTUAL AND PROCEDURAL BACKGROUND

In July 2019, the State filed a child in need of care (CINC) petition alleging that
S.A. (born in 2013), P.A. (born in 2015), and G.A. (born in 2016) were children in need
of care. The CINC petition alleged the children were outside the home unsupervised for
extended periods of time. Of note, the children were "dirty, smelled of body odor and
animals." The petition further alleged that Kansas Department for Children and Families

1

(DCF) had previously removed one or more of the children from the home on prior occasions. Moreover, within the past seven months, DCF had received six intake reports raising concerns regarding the children's welfare.

Prior to the filing of the current CINC petition, S.A. and P.A. had on two occasions previously been adjudicated as children in need of care in November 2015 and November 2016. Also in November 2016, G.A. was adjudicated to be a child in need of care. Almost three years later, in July 2019, a DCF staff member went to the parental home to investigate a report of unsupervised children. The children advised that Mother was home, but they were unable to wake her. A Washington County law enforcement officer was dispatched to the home and placed the children in protective custody as children in need of care. The CINC petition—which is the subject of this appeal—was filed the next day. After a hearing, the district court placed the children in the temporary custody of DCF for out of home placement. The district court also referred the family to St. Francis Community Services (St. Francis).

On October 28, 2019, the parents submitted a statement of no contest, and the district court adjudicated the children as being children in need of care. At the dispositional hearing in December 2019, permanency plans were approved by the district court. At the review hearing in June 2020, the district court ordered visitations with the children at the discretion of St. Francis with "therapeutic input" from the children's therapists. The district court also ordered St. Francis to provide all therapists with the "parent/child logs," ordered St. Francis to "facilitate and coordinate communications with all therapists involved," and ordered "[a]ll parties . . . to cooperate with the pending and scheduled psychological evaluations as well as the family interaction observation."

Almost one year later, on September 23, 2020, the district court held a permanency hearing and determined that reintegration of the family was no longer a

viable goal. The State moved for a finding of unfitness and termination of the parental rights of Father and Mother.

A termination hearing was held on December 21, 2020. Based on the prior CINC adjudications and the parties' stipulations, the district court found the presumption of unfitness under K.S.A. 2020 Supp. 38-2271(a)(3) applied because Father and Mother had at least two prior CINC adjudications when a child was in their care. See K.S.A. 2020 Supp. 38-2271(a)(3) ("It is presumed . . . that a parent is unfit . . . if the state establishes, by clear and convincing evidence, that: . . . (3) on two or more occasions a child in the physical custody of the parent has been adjudicated a child in need of care.").

Upon finding the presumption existed, the burden shifted to the parents to rebut the presumption. The district court found Father and Mother's testimony was sufficient to meet their "low" burden of showing by a preponderance of evidence that they were not unfit at the current time and overcome the presumption of unfitness. After making this finding, the State proceeded with its case-in-chief and presented the testimony of multiple witnesses. Father testified on behalf of the parents.

At the conclusion of the termination hearing, the district court found clear and convincing evidence both parents were unfit by reason of conduct or condition which rendered them unable to care properly for their children and the conduct or condition was unlikely to change in the foreseeable future. K.S.A. 2020 Supp. 38-2269(a). The district court adopted the summary of evidence recounted by the guardian ad litem "as a finding of this Court." The district court cited the following statutory factors in support of its termination order:

- "Emotional illness, mental illness, mental deficiency, or physical disability of the parent, of such duration or nature as to render the parent unable to care for the

3

ongoing physical, mental and emotional needs of the child" under K.S.A. 2020 Supp. 38-2269(b)(1).

- "[T]he use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental, or emotional needs of the child" under K.S.A. 2020 Supp. 38-2269(b)(3).

- "[F]ailure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family" under K.S.A. 2020 Supp. 38-2269(b)(7).

- "[L]ack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child" under K.S.A. 2020 Supp. 38-2269(b)(8).

The district court also ruled that the best interests of the children would be served by termination of parental rights. K.S.A. 2020 Supp. 38-2269(g)(1).

Father appeals.

SUFFICIENCY OF EVIDENCE OF FATHER'S UNFITNESS

On appeal, Father contends the evidence presented at the termination hearing was insufficient to support the district court's finding that he was unfit and his conduct or condition was unlikely to change in the foreseeable future. Father concedes the district court "heard testimony to support its findings," but argues "the body of evidence showed that [Father] had overcome [his] challenges" and he was not "afforded an opportunity to show" he could maintain his success in overcoming these challenges.

4

If a child has been adjudicated a child in need of care, a district court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2020 Supp. 38-2269(a). After making a finding of unfitness, the district court must consider whether termination of parental rights is in the best interests of the child, supported by a preponderance of evidence and reviewed for an abuse of discretion. K.S.A. 2020 Supp. 38-2269(g)(1); *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014).

Our standard of review provides that when an appellate court reviews a district court's termination of parental rights, it should "'consider whether, after review of all the evidence, viewed in the light most favorable to the State,'" it is "'convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's right should be terminated.' [Citation omitted.]" *In re K.H.*, 56 Kan. App. 2d 1135, 1139, 444 P.3d 354 (2019). In reviewing a district court's decision based on a clear and convincing evidence standard, an "appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

The revised Kansas Code for Care of Children (KCCC), K.S.A. 2020 Supp. 38-2201 et seq., authorizes a district court to terminate parental rights based on certain statutory findings made after a child has been adjudicated a child in need of care. K.S.A. 2020 Supp. 38-2269(a). Ordinarily, the district court evaluates whether a parent is unfit by considering a nonexclusive list of factors provided in K.S.A. 2020 Supp. 38-2269(b) and (c). Any one of the factors standing alone may provide sufficient grounds for termination. K.S.A. 2020 Supp. 38-2269(f).

5

As mentioned earlier, the district court relied on four statutory factors to find that Father was an unfit parent and was unlikely to change his parenting behavior in the foreseeable future. Each factor will be considered separately.

*K.S.A. 2020 Supp. 38-2269(b)(1).*

A district court may find a parent unfit if there is clear and convincing evidence that the parent suffers from an emotional illness, mental illness, mental deficiency, or physical disability of such duration or nature as to render that parent unable to care for the ongoing physical, mental, and emotional needs of his or her child. K.S.A. 2020 Supp. 38-2269(b)(1). As to this factor, the district court found "the children's needs are exactly what the parents cannot provide. . . . It's as if the—the children are lacking in the very areas that the parents are lacking. And the parents can't fulfill the needs they don't have." The district court's adopted findings similarly stated that the children's "needs are significant" and the parents "stop participating and doing the things that get them in a healthy state for these children" once the services offered by the agencies—or ordered by the court—have ended.

Father does not directly challenge this finding as to this statutory factor but argues that he was unable to care for the ongoing needs of his children because he was "not provided the tools needed and [was] not given the opportunity to demonstrate [his] parenting skills." Despite Father's claim that he was not given the tools or opportunity to show he can meet the needs of his children—an issue that will be analyzed later when addressing termination under K.S.A. 2020 Supp. 36-2296(b)(7) and (8)—there is clear and convincing evidence to support the district court's finding as to K.S.A. 2020 Supp. 38-2269(b)(1).

Carly Bloomfield, a clinical social worker who currently provides therapy for P.A. and G.A., previously provided therapy to S.A., and conducted family therapy with

6

Mother and Father, testified at the termination hearing. Upon reviewing Father's court-ordered psychological evaluation, Bloomfield concluded that Father's "limitations" are in those aspects of parenting that are most critical to the children's "needs."

Bloomfield opined that Father's limitations were due to his lack of attunement, which she defined as "the ability to . . . recognize and understand and engage with another individual. . . it's kind of like . . . you're able to read their cues and then respond. You're also able to understand your own cues and respond appropriately." Bloomfield recognized the parents' "ability to complete tangible tasks" but testified they are "not able or it doesn't appear that they have the capacity to read their children's nonverbal cues, their emotional states. And then respond appropriately."

Bloomfield testified that Father's inability to attune to his children's needs is based on his inability to regulate his own emotions testifying, "If you are not emotionally regulated, you're going to have a hard time being attuned with somebody because you're not really aware what's going on. And if your nervous system is . . . dysregulated or hyper-aroused or hypo-aroused, you're not going to be able to then meet someone else's emotional needs." Bloomfield testified that she has previously worked with the parents on regulating their own emotions for them to meet their children's emotional needs, "[b]ut it was difficult for them to do that when they, themselves were the ones activated as well."

Bloomfield noted, for example, that P.A.'s psychological evaluation "reinforced his need for consistency, structure, predictability, routine, and compassion." And P.A. "struggles with emotion reg—regulation, transitioning, adaption to change, following limits . . . feelings of abandonment and fear of uncertainty." In contrast, Father's psychological evaluation "stated his responses reflect an area of personal weakness related to his ability to create the rules and provide structure in his . . . children's environment." According to Bloomfield, Father is also "likely to be inconsistent in

disciplining or correcting his children's behavior. So [P.A.] needs structure and consistency. And that is a limitation that [Father] has."

Bloomfield stated that Father's lack of attunement is a concern because it helps "the child feel safe" and helps a child believe "that they can trust adults to—to get their physical needs met." Attunement also gives "the child a voice" and is important because "we want kids to be able to grow up and to feel love, to feel important, to know adults can be trusted and their needs can be met . . . specifically by adults." She concluded that "because [Mother and Father] weren't able to consistently meet those needs, [these] kids do not have those beliefs. And they have insecure attachments."

The court reports prepared by Bloomfield on behalf of P.A. and G.A. also discussed Father's court-ordered psychological examination. Bloomfield noted a few examples of Father's limitations: Father demonstrated "inconsistent structure and discipline when he observed [P.A.] hitting [Mother] in the face four times [and he] failed to provide [P.A.] with any redirection or support to [Mother.]" This example indicated Father was either "not able to provide [P.A.] with the amount of structure, redirection, and consistency that [P.A.] needs to maintain safe behavior or that [Father] is unaware how his failure to integrate structure contributes to [P.A.'s] behavior." Bloomfield added that Father's inconsistent interventions with P.A. "[do] not promote a positive prognosis for [P.A.] due to [his] prognosis being partially depending on his caregivers being able to provide appropriate consequences and discipline."

Bloomfield also noted that P.A.'s psychological evaluation indicated he was "likely . . . easily influenced by the behavior of others" and it was recommended that caregivers point out examples of "negative, aggressive, or impulsive behavior" for P.A. to "develop empathy and express himself appropriately." Bloomfield opined it "may prove difficult" for Father to model "healthy behavior and emotional responses" because of his "need for power and control, impulsivity, aggression, and oppositional actions as well as

8

his difficulty with emotion[al] regulation." She added, "If [Father] continues to display such symptoms, his impairment in functioning will negatively impact [P.A.'s] prognosis." Bloomfield made similar conclusions regarding G.A.

Additionally, although Father is currently receiving mental health services, the record shows his attendance is inconsistent and dependent on whether the family is involved in CINC proceedings. Bloomfield reported that the parents' "attendance and commitment to remain in services with the same provider is not sufficient and causes concern for them to make timely progress with improving their mental health symptoms and gaining the necessary skills to adequately parent their children." Bloomfield noted that Father began services from one provider but switched to a different provider after four appointments. She also noted that when she was the family therapist, "the family cancelled or no showed 22 out of 74 scheduled sessions." And, "[m]ore importantly, when aftercare services ended . . . the family no showed five times and cancelled five appointments out of the 17 scheduled sessions." Bloomfield opined that the family's lack of participation in her services, as well as the services offered by the agencies, shows "the parents gradually lose focus on the importance of attendance once foster care services have concluded."

Finally, Bloomfield's court report also addressed whether Father was capable of change in the foreseeable future. According to Bloomfield, it would "take a significant amount of time in therapy for [Mother and Father] to achieve the desired progress on the issues" of follow through, attunement, and emotion regulation. This was also the district court's conclusion when it observed that the parent's "have the ability to complete certain tasks. And certainly that is what the parents want this Court to believe and understand." Nevertheless, the district court found, "The testimony of the parents is contrary to the testimony of almost everyone else. Although they can complete a task short-term, the long-term issues are of greater concern."

9

After reviewing all the evidence in the light most favorable to the State, we are convinced that a rational fact-finder could have found it highly probable that Father suffers from an emotional illness, mental illness, or mental deficiency of such duration or nature as to render him unable to care for the ongoing physical, mental, and emotional needs of his children, now or in the future. See K.S.A. 2020 Supp. 38-2269(b)(1). We find no error in the district court's finding of unfitness under this statutory factor.

*K.S.A. 2020 Supp. 38-2269(b)(3).*

A district court may also find a parent unfit if there is clear and convincing evidence that the parent's use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature renders the parent unable to care for the ongoing physical, mental, or emotional needs of his or her child. See K.S.A. 2020 Supp. 38-2269(b)(3).

Regarding this factor, the district court found there were "issues of substance abuse." The district court noted there were "denials and explanations" but "Father had tested positive in this case. And that the children came into custody with positive hair follicle testing." The court's adopted findings added that Father failed a drug test two months before the termination hearing and although he had initially denied the result, he "did confirm [to his therapist] that he had relapsed and used methamphetamine." Moreover, Father's refusal to acknowledge his substance abuse problem was a "pattern."

Father's former therapist, Anita Osler, testified at the termination hearing. Osler is a licensed master social worker formerly employed as a mental health and substance abuse therapist at Pawnee Mental Health. She testified to her previous work with Father, stating they worked on frustration tolerance and how to communicate with others "in a non-hostile or aggressive way." She testified that Father attempted to take responsibility for previous behaviors, but he had "some difficulty" with "feelings of persecution and . . . projecting responsibility on others." Osler testified that at the time she stopped providing

10

services to Father, his prognosis was "[g]uarded" due to a recent methamphetamine relapse.

Osler testified regarding Father's substance abuse issues and his minimization of the problem. When discussing his relapse, Osler testified Father initially "denied use" and claimed the recent drug test "was a false positive." After Osler indicated she had reviewed the test results and knew "the difference between a false positive and a positive," Father asked Osler "whether or not [Osler] believed it was better for his CINC case to admit to the use or continue to deny the use." Osler informed him it was not her job to "determine . . . any legal ramifications," whereupon Father told her the test result was accurate and he had obtained the methamphetamine from an individual at a narcotics anonymous (NA) meeting.

Osler testified that Father then "shared with [her] that he believed that the recreational use of methamphetamine should not be treated differently from alcohol use or marijuana use." Osler said they discussed whether Father could adequately provide care for his children while under the influence of methamphetamine, and "[a]t that time [Father] indicated that any methamphetamine use would be in the absence of his children." After Father confirmed the positive test to Osler, she asked him if he would be open to substance abuse treatment. Father stated that he believed attending NA meetings "was enough" and that "he did not believe that he had . . . concern with . . . methamphetamine."

At the termination hearing, Father continued to minimize his drug use. While Father tested positive for amphetamines and methamphetamines about two months prior to the termination hearing, he still maintained the result was a "false positive." Towards the end of his testimony, however, Father acknowledged that the positive test result occurred after the district court found reintegration was no longer a viable option and he "submitted to a moment of weakness and went instantly into denial."

11

Father also testified the "preliminary results" of his drug and alcohol evaluation indicated "nothing . . . further was needed" until the caseworker "contacted them and suggested that there may be usage" and the recommendation was changed. Father's drug and alcohol evaluation was not included in the record on appeal.

Bloomfield testified that Father's substance abuse, and his denial of that abuse, supports her belief that Father is unfit to parent his children for the foreseeable future. Bloomfield noted there have been periods of sobriety but based on information from DCF and other agencies "there continues to be a pattern of usage." Equally concerning is Bloomfield's belief that Father maintains "a pattern of denial . . . or rationalizing why the children had . . . positive hair follicle tests." Bloomfield reiterated the fact that P.A. and S.A. had hair follicle tests positive for methamphetamine in this proceeding, and G.A. had a positive hair follicle test in the prior CINC case. According to Bloomfield, "there has not been a case . . . from start to finish, that there has not been some type of issue with relapse or substance abuse."

Of note, Bloomfield has worked with the family since early 2017, and she has focused her attention on mental health needs of the two younger children who have received several diagnoses related to their mental health. Bloomfield opined that Father was unfit because his own mental health issues impede his ability to provide for the needs of his children. She further stated Father's patterns with mental health services—as well as his patterns regarding substance abuse and denial—show he cannot make the "permanent shift" needed to reintegrate the family. Bloomfield testified:

> "[The parents] always need that kind of extra service or extra adult to help—help
> stabilize them so that they can be you know meeting minimal standards. But take that the
> stabilizing force out, which is typically one of the agencies or the court. And their
> functioning regresses over time to the point where the Court is involved again."

Upon our review in the light most favorable to the State, we are convinced that a rational fact-finder could have found it highly probable that Father's use of narcotic or dangerous drugs of such duration or nature rendered him unable to care for the ongoing physical, mental, or emotional needs of his children. See K.S.A. 2020 Supp. 38-2269(b)(3).

*K.S.A. 2020 Supp. 38-2269(b)(7).*

K.S.A. 2020 Supp. 38-2269(b)(7) provides that when determining the fitness of a parent, one of the factors the court may consider is the "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." This statutory factor focuses on reasonable efforts expended by service providers to achieve the goal of rehabilitation. It does not require the public or private agencies to provide every possible resource to the family; only that the agencies made a reasonable effort. *In re A.W.*, No. 121,666, 2020 WL 4035078, at *6 (Kan. App. 2020) (unpublished opinion).

The district court's adopted findings were that St. Francis made reasonable efforts and "has provided everything available to this family" and they "went above and beyond and provided additional tools and resources to this family." Moreover, the district court did "not believe that there [are] any other services that could've been implemented to assist these parents in meeting the standard of fitness today or fitness in the foreseeable future for these children."

Father asserts the district court "relied significantly on the children's past trauma and the parents' inability to meet the children's needs, but the court ignored the fact that the parents were not given the tools to meet their children's needs." Moreover, Father argues that even if the tools had been provided, the parents "would not have been able to use them because Saint Francis Ministries severely limited their interaction with their

13

children, effectively stifling any chance the parents had to show that they could meet their children's needs."

Mother and Father both testified to their belief that St. Francis did not make a reasonable effort to rehabilitate the family. When Mother was asked whether St. Francis provided her the services to reintegrate the children, Mother responded, "Absolutely not. No." Father's issues with St. Francis ran deeper. Father testified that Rascheal Nutsch, a licensed clinical social worker, supervisor at St. Francis, and the caseworker assigned to this case and the family's previous cases, did not help them to achieve reintegration. The parents were so aggrieved by Nutsch that they recorded many of their conversations and visitations when she was present "to protect our rights and interests." Father also testified that he reported Nutsch to her supervisor and the Behavior Science Board for Social Workers.

Nutsch testified that Father reported her to the Behavioral Science Board for Social Workers in February 2020, but the claim was determined to be "unfounded and dismissed." Nutsch also confirmed that Father reported her to her supervisor on "many, many occasions" and Father recently told her that "he was reporting me weekly."

Nutsch directly contradicted the testimony of Mother and Father. She testified that she has a long history with the family in this and prior CINC cases working towards reintegration and providing them with aftercare services. Nutsch testified that St. Francis has "afforded this family every possible and imaginable resource available" and she has "extended and expanded [her] professional abilities . . . further with this family than [she has] in a lot of cases."

In particular, Nutsch testified that St. Francis offered services to the family that are not normally offered by the agency. These services included conducting trauma assessments of the children, conducting "wraparound meetings" with all the professionals

involved in the case, providing visit logs to every therapist, and recording visits and providing the recordings to therapists for review. As a result, Nutsch believed St. Francis had "exhausted" all options for services to provide the family.

Still, despite the extra services provided to the family, Nutsch believed Mother and Father "continue to just be incapable of doing the very basic skills." Nutsch testified that despite the parent's ability to complete case plan tasks, they have not shown they can care for the children because "the pattern shows that if these children were to go home and they were to do after-care services for six months—in seven or eight months we would be back here again."

At the conclusion of the evidence, the district court noted that it "heard testimony that the parents in this case have the ability to complete certain tasks. And certainly that is what the parents want this Court to believe and understand." The district court noted all the case plan tasks the parents completed and recounted their testimony that the "agencies will not let them put into practice what they have already learned." But the district court concluded, "The testimony of the parents is contrary to the testimony of almost everyone else. Although they can complete a task short-term, the long-term issues are of greater concern."

The district court carefully evaluated the credibility of the witnesses who testified about their conflicting opinions relating to this statutory factor of unfitness and discounted the testimony of Mother and Father. On appeal, our standard of review provides that our court "does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact," and as a result, the district court's credibility determination will not be disturbed. *In re B.D.-Y.*, 286 Kan. at 705.

After reviewing all the evidence in the light most favorable to the State, we are convinced that a rational fact-finder could have found it highly probable that reasonable

15

efforts made by appropriate public or private agencies failed to rehabilitate the family. See K.S.A. 2020 Supp. 38-2269(b)(7); *In re K.H.*, 56 Kan. App. 2d at 1139. We find no error in the district court's finding of unfitness under this statutory factor.

*K.S.A. 2020 Supp. 38-2269(b)(8).*

When determining the fitness of a parent, the court may consider the "lack of effort to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." K.S.A. 2020 Supp. 38-2269(b)(8). On appeal, Father argues it is "bewildering" that the district court found the parents failed to take responsibility for their actions. According to him, the evidence shows that he was "invested in therapy" and took the case plan tasks seriously. Father adds that even if the parents failed to take responsibility for their actions, "it would not preclude them from having their children reintegrated, and no rational fact-finder could find that it would."

Regarding this factor, the district court focused on Mother and Father's "hostility and uncooperativeness" toward St. Francis and other professionals assisting the family in reintegration. In the district court's view, the parents' hostility and uncooperativeness resulted in the parents "not taking responsibility" for their actions. The district court concluded that the parents act "[a]s if it is everyone else's fault that their children's behaviors are escalating." Additionally, the district court's adopted findings regarding this statutory factor emphasized the parents' unstable employment, reluctance to acknowledge domestic violence in the home, interactions with DCF, refusal of services, and the recurring nature of the parenting failures of Mother and Father as proof that the parents were unable or unwilling to change their circumstances to meet the needs of the children.

The district court found that Father exhibited a lack of effort to adjust his conduct, condition, or circumstance to meet his children's needs and that these circumstances would not change in the foreseeable future. According to the district court, Father's

16

parental unfitness was unlikely to change "based upon the past seven years. It's a repeating pattern. A child in need of care case is filed. Services are provided. Services are rejected or not good enough or not what [the parents] want. They follow through to some degree. After-care ends and almost immediately the cycle begins again."

This behavioral cycle was confirmed by Bloomfield, who opined that the parents are unfit for the foreseeable future "[b]ased on their pattern over the last six years." She saw patterns regarding:

- Substance abuse. Bloomfield noted the parents were "rationalizing why the children had you know, positive . . . hair follicle tests." She noted that all three children had experienced positive hair follicle tests. As detailed earlier, Father also had used methamphetamine two months before the termination hearing. And Bloomfield and Osler testified regarding Father's minimization of illicit drug use.

- Domestic violence. Bloomfield testified there may be periods of time when Mother and Father "function really well," but "typically that is unfortunately when their children are in custody and they are receiving services." The last reported instance of domestic violence occurred approximately one month before the children were removed from the home. Osler testified that Father was not forthcoming regarding domestic violence issues but eventually acknowledged the children had seen domestic violence in the home. According to Osler, despite this acknowledgement, Father "does not recognize how his children's exposure to domestic violence and his behaviors have contributed to his children's current mental health symptoms."

- History of unemployment and financial instability. Both parents "struggle to keep a job." Mother and Father were employed by Sonic. But Father testified that they were both "let go . . . due to no control [*sic*] of our own." Father testified that he is

17

now self-employed and makes more money on his own than with "W-2 employment." According to Bloomfield, the family "seem[s] to always figure out a way" to eventually pay their bills and rent, but she is concerned regarding "those financial stressors" because they are "directly correlated to then other stressors that then cause . . . domestic violence [and] substance relapse."

- Hostility towards family service agencies. Bloomfield testified to a pattern of "being hostile and uncooperative in terms of working with the agencies." Bloomfield testified that "if you're on their side so to speak" then the parents "engage" and "they reciprocate." But once the parents disagree with the agency, their interactions "are not as pleasant or positive." Bloomfield testified that the parents' hostile behavior was long-standing. As noted earlier, Father's conduct towards Nutsch was especially hostile. She testified that in addition to reporting her to superiors, "[Father] sends me text messages where he cusses me out and threatens me." Bloomfield believed she had a good relationship with the parents until she recommended virtual visits, "[T]hen . . . all [of a] sudden I became the bad guy again." She added, "[Nutsch] is the bad guy. Now their attorney—they don't want their attorneys. I mean the pattern continues."

- Mental health services. As discussed earlier, Bloomfield testified about a pattern regarding Father's inability to receive therapy from a long-term mental health provider. When the parents were prescribed medication, their compliance was irregular: "[T]hey would take medicine, do better. Then stop it. And then take it."

In summary, Bloomfield addressed the parent's lack of effort in meeting the children's needs by observing that their participation was dependent upon whether the children were in their custody or in CINC proceedings. The parents were "very involved" when the children have been removed from the home, but their participation decreases as

18

they transition into aftercare. When aftercare ends, there is a "direct pattern of their lack of participation and their ability—accountability in keeping up with the responsibilities."

Bloomfield's testimony was corroborated by Nutsch who believed the parent's ability to complete case plan tasks was not indicative of their progress because their recent and past history indicated that the children "would be back here again" if they were reintegrated into the home. She testified the parents are "capable of doing some basic tasks," however, they are "not capable of consistently making this change permanent for their family."

Nutsch and Bloomfield also testified regarding Mother and Father's inability to change their conduct during visitations with the children. As Nutsch explained, the type and length of a parent's visitation with a child is dependent on what is being observed and overall case plan progress. In this case, the visits progressed to four-hours long, unsupervised visits in the family home. Nutsch testified that between the visits, "we began to see an extreme amount of reactions from the kids." The children could not sleep, they were aggressive with each other and their caregivers, and P.A. "was having enuresis and encopresis concerns." In Nutsch's opinion, as the visits progressed and the children were exposed more often to their parents, St. Francis staff noticed the children "fall apart very quickly. . . . [in] very dramatic ways."

Because of the children's behavior, the visitations were adjusted and ultimately were conducted virtually due to the pandemic. Once in-person visitations resumed, Bloomfield recommended P.A.'s visits remain virtual because "he could not tolerate the in-person interactions." The virtual visits were a point of contention for Mother and Father, who argued below, and on appeal, that their interactions with P.A. "were limited to minutes per week" and they "were not permitted to redirect his behaviors." The parents' primary defense throughout these proceedings was that they were being evaluated, but they were never advised on the appropriate ways to handle the children

19

and fulfill their needs. As the district court found, however, the parent's testimony was "contrary to the testimony of almost everyone else." Nutsch testified she had "repeatedly" given the parents tools and recommendations and instructions on how to utilize them when she observed their visits with the children.

Upon our review of all the evidence in the light most favorable to the State, we are convinced that a rational fact-finder could have found it highly probable that Father lacked the effort to change his circumstances, conduct, or condition to meet the needs of S.A., P.A., and G.A. Moreover, given Father's longstanding inability to maintain any positive parenting changes he made, and his continuing substance abuse, the district court did not err in concluding that his parental unfitness will continue for the foreseeable future. The best indicator of future performance is past performance. Accordingly, courts can consider a parent's past history as evidence regarding the reasonable likelihood of any change in parental fitness. See *In re Price*, 7 Kan.App.2d 477, 483, 644 P.2d 467 (1982). We find no error in the district court's finding of unfitness under K.S.A. 2020 Supp. 38-2269(b)(8).

THE BEST INTERESTS OF THE CHILDREN

For his second issue on appeal, Father claims the district court abused its discretion by finding it was in the children's best interests to terminate his parental rights because it failed to "properly analyze[] the matter." According to Father, "[t]he district court's decision was void of consideration of the emotional trauma that would be caused to the children [and the] court further failed to weigh the likely trauma against a further delay in permanency."

After making a finding of unfitness, the district court must consider whether termination is in the best interests of the child. K.S.A. 2020 Supp. 38-2269(g)(1). Our Supreme Court has established an appellate court's standard of review in considering

20

whether a district court has abused its discretion in determining the best interests of the child:

> "When an appellate court reviews a district court's best interests of a child determination, it recognizes that *the district court is in the best position to make the inquiry* and, in the absence of abuse of sound judicial discretion, its judgment will not be disturbed on appeal. Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, *if no reasonable person would have taken the view adopted by the district court*; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." (Emphases added.) *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, Syl. ¶ 4, 392 P.3d 68 (2017).

Of note, it is Father's burden to show that the district court abused its discretion. See *Gannon v. State*, 305 Kan. 850, 868, 390 P.3d 461 (2017).

Since Father does not claim that the district court's abuse of discretion was based on an error of law or fact, the issue presented is whether no reasonable person would have taken the view adopted by the district court that it was in the children's best interests to terminate Father's parental rights.

The district court found by a preponderance of evidence that termination of parental rights was in the best interests of the children. See K.S.A. 2020 Supp. 38-2269(g)(1); *In re R.S.*, 50 Kan. App. 2d at 1115-16. In making this determination, the district court was required to "give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2020 Supp. 38-2269(g)(1).

Bloomfield and Nutsch both opined that termination of Father's parental rights was in the best interests of the children because they need permanency and stability.

21

Bloomfield testified, "[T]he kids need a stable, safe, secure, permanent place in order . . . to heal and develop a secure attachment." Nutsch has seen the children succeed in this way, adding, "the more structure, the more stability and the more safe [*sic*] people they're exposed to, the better they do."

These opinions were echoed by Pamela Cornwell, who is a licensed clinical marriage and family therapist and the clinical director at St. Francis. Cornwell is certified in the neuro-sequential model of therapists, as well as in trauma systems therapy. She prepared the children's trauma assessments. Based on her assessments, P.A.'s development is at a "critical level" that can be overcome, "but it's going to take a tremendous amount of work and effort to do that." If his developmental issues remain unaddressed, Cornwell expects to see "a chronic problem with social interactions," such as making and maintaining friendships and getting along with caregivers, teachers, and adults. She continued, "[W]e could probably expect that he would have difficulty with his education . . . simply because when I'm at high level of distress all the time, it's hard for me to listen and pay attention." Cornwell opined that P.A. has the ability to "lessen that gap" and catch up with his peers developmentally, but it will take "a lot of very consistent work, a lot of [doing] of the right kinds of interventions."

Cornwell was also concerned that S.A. and G.A. were not getting the "right kinds of support and interventions" to help overcome their developmental delays as well, but the trauma assessments indicated they were not at the same "critical" level as P.A.

Kellie Barton, a licensed clinical psychotherapist and counselor, is the individual therapist for S.A. She testified regarding S.A.'s diagnosis and prognosis. Barton stated S.A.'s prognosis is "really contingent upon her caregiver's ability to provide safety, consistency, structure, modeling of appropriate behaviors and being able to support appropriate age and developmental milestones and needs."

22

The guardian ad litem argued that termination was in the best interests of the children. She argued the children have been declining with each CINC case and "at some point we have to stop and put the children first." She continued, "And these children are at a critical point where if we do not step in and correct their opportunity to have the environment they need, we are going to have children that have significant and perhaps unmanageable needs in the future."

Bloomfield reiterated that "time is of the essence in order for these children to have a better prognosis in—in terms of healing." Similarly, Cornwell stated when discussing P.A.'s need for a permanent home that the "longer we—we don't have the right kinds of safety and security and interventions with him, the more that gap is going to widen between [P.A.] and—and peers." Cornwell added that all three of the children have developmental needs, "[a]nd so that has to be also considered in thinking about what kinds of resources—emotional, physical are needed for the caregivers to be able to meet adequately the needs of all three of the children."

Bloomfield and Cornwell's testimony regarding the need for prompt placement of the children in a safe, secure, and stable home, is consistent with Kansas statutes and caselaw. As our court has stated:

> "The Revised Kansas Code for Care of Children—K.S.A. 2018 Supp. 38-2201 et seq.— recognizes that children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that different perception typically points toward a prompt, permanent disposition. K.S.A. 2018 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings 'in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's')." *In re M.S.*, 56 Kan. App. 2d 1247, 1263-64, 447 P.3d 994 (2019).

23

In this case, the evidence is compelling that the children are at risk without prompt placement in a safe, stable, and permanent home. As recounted earlier in this opinion, there was substantial competent evidence to support the opinions of Bloomfield, Nutsch, Cornwell, and Barton. Based on this evidence, it cannot be said that the district court failed to properly consider whether termination was in the best interests of the children.

Father has failed to meet his burden to prove that "no reasonable person would have taken the view adopted by the district court." *Smith*, 306 Kan. 40, Syl. ¶ 4. The district court's legal conclusion that termination of parental rights was in the children's best interests was in accordance with Kansas statutes and caselaw, and an appropriate exercise of judicial discretion.

Affirmed.