NOT DESIGNATED FOR PUBLICATION

No. 125,230

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of M.T.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; MICHAEL J. HOELSCHER, judge. Opinion filed December 9, 2022. Affirmed.

*Grant A. Brazill*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for appellant natural father.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before ARNOLD-BURGER, C.J., HILL and SCHROEDER, JJ.

PER CURIAM: Young children need love and nurturing—not yelling, screaming, punching, and kicking. There is no more dangerous place for a young defenseless child than a home aflame with domestic violence. Rather than loving parents that care for each other and for their children, children in a violent home are in peril. Perhaps they are not the focus of the violence, but such children are still in the cauldron and suffer harm from simply being there—mute witnesses to the horrible spectacle around them. This is such a case.

M.T. was born in August 2018. In her first two years, starting at her birth, the Kansas Department for Children and Families received nine intake reports involving M.T.'s family. These reports alleged, among other things, that Father physically and

emotionally abused M.T. and her mother. As the domestic violence continued, the State alleged M.T. was a child in need of care and brought the matter to court. After that, with the passage of time and continuing violence, the State sought termination of Father's parental rights. The district court finally did terminate his rights to M.T. and he appeals, claiming that there was insufficient evidence that he was unfit. And he argues the court abused its discretion by finding that it was in M.T.'s best interests that his parental rights be terminated.

Our review of the record reveals ample evidence for the court's rulings and we affirm. There is no abuse of discretion here.

*We summarize the evidence from this record.*

After M.T. was born, Mother gave birth to another daughter in 2019, who later died from Sudden Infant Death Syndrome. This tragedy added to Mother's mental health issues and increased her difficulties parenting M.T. Mother became pregnant again shortly after, but she continued to experience domestic violence issues with Father.

In August 2020, when M.T. was about two years old, the State petitioned the district court to find that she was a child in need of care after police responded to a domestic violence call. Mother alleged that Father had threatened her and punched her in the stomach while she was pregnant. This call was the 28th report police had received that year involving Father and Mother.

The district court entered an ex parte order placing M.T. into protective custody. Shortly after, the court held a hearing and ordered that M.T. remain in the State's temporary custody. Father received oral notice of this hearing but did not appear, so the court found him in default.

Saint Francis Ministries—an agency that contracts with the State to oversee family reintegration in child in need of care cases—contacted Father to tell him about the upcoming initial case plan meeting, which he attended by telephone. The caseworker went over the case plan with him orally, and she later testified that Saint Francis then would have mailed him a written copy. Father denied ever receiving a written copy.

Father then sent the caseworker a series of text messages complaining about Mother and requesting a different caseworker. He texted the caseworker that he wished Mother "would go somewhere and die." When the caseworker told him that message was inappropriate, Father replied, "IDGAF [I don't give a fuck] how dumb and stupid your [*sic*] are . . . I don't want a god damn thing to do with the kids or entity now move the fuck on." He then told the caseworker, who was pregnant, that he "pray[ed] that you pos [piece of shit] kids your [*sic*] pregnant with dies or kills you during birth stupid ass bitch."

A few days later, Father was arrested and charged with making a criminal threat and harassment by telecommunications device. He had sent Mother a message stating, "Fucc you and the tich ass kid I will kill both of you DB ass" (Fuck you and the bitch ass kid I will kill both of you dumb ass). When the State read this message aloud during the termination hearing, Father laughed and denied sending it.

Father later pleaded guilty to these charges and received probation with an 11-month underlying prison term. Mother also filed a third protection from abuse petition against Father after this incident, but she did not appear at the hearing. When Father committed these crimes, he was already on probation in another case from 2018 where he had pleaded guilty to aggravated domestic battery against Mother and received probation. And in a third case, also from 2018, Father had pleaded guilty to violating a protective order—Mother was the victim of this crime, too. Father violated his probation multiple times in both of his 2018 cases and had it revoked in one because of his new crime.

3

After Father's September 2020 arrest, he spent the next year incarcerated. This meant that he was incarcerated for about 11 of the first 12 months of M.T.'s case. And a month before his arrest, Mother had given birth to another daughter who went into the State's care with M.T. shortly after. The district court then held another hearing and granted the State's petition to adjudicate M.T. a child in need of care. Father had the opportunity to participate in this hearing virtually from jail but refused, so the district court again found him in default.

After Father went to jail in September, his caseworker sent him a letter in November to update him on how his daughters were doing, and he responded that he could not complete court orders from jail. The caseworker sent another letter in December giving an update and asking about court orders; Father did not respond. The next contact between Saint Francis and Father seems to be a few months later—in March 2021—when the caseworker sent another letter updating him on M.T. and her sister.

In April 2021, M.T. and her sister moved in with Mother. Over the next several months, while Father was incarcerated and the children were with Mother, the record shows no contact between him and Saint Francis. Nor was there any contact between him and M.T. because he was in jail.

*Father gets out of jail.*

Father got out of jail and went back on probation in August 2021, a year into the case. He contacted Saint Francis and told caseworkers that he had completed a parenting class in jail and provided a certificate of completion. Father also obtained employment after his release and completed drug testing. And he appeared to have also begun visits with M.T. and her sister, since they were now with Mother.

4

But in October 2021, M.T.'s 13-month-old sister died while in Mother's care. The death was a homicide and Mother was arrested and charged with first-degree murder and child abuse. Three-year-old M.T. was there and witnessed her sister's death, which caused significant trauma.

Father was at work when this happened, and when he arrived at Mother's house police arrested him for a probation violation because he had lied to his probation officer about his address. He had stated that he was living at a shelter when in fact he was living "on the streets." He later admitted to violating his probation and the district court revoked it, imposing a 12-month jail sentence to be followed by 12 months' probation and a successful stay at residential community corrections. Father remained in jail serving this sentence for the rest of M.T.'s case.

*The State seeks to terminate Father's parental rights.*

While father was still in jail, the State moved to terminate his parental rights to M.T. The termination hearing did not go smoothly as Father was combative and uncooperative.

Father eventually testified. He acknowledged that he was serving a 12-month sentence, with October 2022 as his latest possible release date. But he asserted that he could get out in April at the earliest—which was about three months away. And although the journal entry reflects that Father must complete a residential community corrections program after his release, Father testified—without proof—that this condition had been lifted. And despite his current incarceration, Father testified that M.T. could live with him at the Sedgwick County Jail.

As to housing and employment after his release, Father testified that he could find a place to live when he was released and that he had his old job awaiting him. In fact, he

5

testified that he was still employed there despite being incarcerated and not having worked a shift or received a paycheck since before his incarceration.

Father admitted to physically assaulting Mother once, but did not recognize the possible effect of his actions on M.T. There was evidence that M.T. feared Father and had run away from him when he tried to change her diaper, which caseworkers attributed to M.T. witnessing Father's domestic violence. Rather than acknowledge this possibility, Father suggested—without evidence—that M.T. feared him because her foster family had abused her.

As far as reintegration tasks, Father had completed a parenting class in jail and drug tests upon his first release from jail, but his testimony was unclear about what else he had done. He testified that when he was arrested, he was "in the process" of completing multiple tasks—a drug and alcohol evaluation, a mental health evaluation, and a domestic violence assessment. But he then testified that these tasks were all complete, though the record does not show that they were.

At the time of the termination hearing, Father was 41 years old and had 13 living children. He also had five deceased children, including M.T.'s two sisters. There is little evidence about his relationship with M.T.; he did not complete any visits through Saint Francis, but he appears to have had some visits when M.T. and her sister were reintegrated with Mother. When asked about M.T., Father knew her age, that she liked Cocomelon and playing with tablets and phones, and that she was a picky eater.

Two caseworkers from Saint Francis also testified at the termination hearing. His first caseworker testified about her phone and text message contact with Father early on, including his threatening text messages to her about her and her unborn child. Father denied sending these messages or ever communicating with the caseworker. The caseworker testified that they had multiple conversations via phone and text message, but

6

they never met in person. When they communicated, Father was confrontational and yelled at the caseworker, displaying the same demeanor he had shown in court during his testimony. The caseworker was unaware of Father completing any tasks when she was assigned to the case—from when it began to when the children reintegrated with Mother.

The second caseworker who testified had overseen the case since M.T. went back into State custody after her sister's death. She described her visit with Father in jail and noted that he had many outstanding tasks and had not participated in the case when he was briefly out of jail. M.T. had been in the State's care for about a third of her life, and the caseworker needed at least one year of stability from Father before she would consider reintegration.

M.T.'s behavior had also changed since she witnessed her sister's death. Her placement family reported that she had pretended to smoke green beans as if they were marijuana, used profanity, and beat her doll's head against a table. All these behaviors were new for M.T. after her recent traumatic experience. And as a result, she needed stability, consistency, love, and support in her life.

*The court terminates Father's parental rights.*

The court found Father unfit under five statutory factors:

- K.S.A. 38-2269(b)(5)—conviction of a felony and imprisonment;
- K.S.A. 38-2269(b)(7)—failure of reasonable reintegration efforts by the appropriate agencies;
- K.S.A. 38-2269(b)(8)—lack of effort to adjust his circumstances;
- K.S.A. 38-2269(c)(2)—failure to maintain regular visitation, contact, or communication with M.T. or her custodian; and
- K.S.A. 38-2269(c)(3)—failure to carry out a reasonable reintegration plan.

The court also found that Father's unfitness was unlikely to change in the foreseeable future and that termination was in M.T.'s best interests. In its ruling, the court also noted that Father was not credible, but the caseworkers were.

*There is sufficient evidence to support the court's ruling.*

The district court found Father unfit under K.S.A. 38-2269(b)(5), (b)(7), (b)(8), (c)(2), and (c)(3). A valid finding under any of these factors on its own "may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 38-2269(f). Father argues that there is insufficient evidence in this record to support those findings.

Sufficient evidence supports the district court's findings under all five factors.

I.      FATHER'S INCARCERATION

The district court found that Father was unfit for "conviction of a felony and imprisonment" under K.S.A. 38-2269(b)(5). Father concedes on appeal that he was unfit under this factor at the time of the termination hearing because he was incarcerated for a felony conviction. But he asserts that there was insufficient evidence that this condition would continue into the foreseeable future because he was several months into a one-year sentence and could get out in as soon as three months, and nine months at the latest. That may not seem like a long period of time, but it is for a two-year-old child at the time.

Courts evaluate "'foreseeable future'" from a child's perspective because children have a different perception of time. *In re R.S.*, 50 Kan. App. 2d 1105, 1117, 336 P.3d 903 (2014). For a child, "a month or a year seem[s] considerably longer than it would for an adult." *In re M.S.*, 56 Kan. App. 2d 1247, 1263, 447 P.3d 994 (2019); see K.S.A. 38-2201(b)(4). A court can look to a parent's past conduct as a predictor of the foreseeable

8

future. 56 Kan. App. 2d at 1264; *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

The circumstances of a given case govern whether a parent may be unfit for the foreseeable future under K.S.A. 38-2269(b)(5). Brief periods of incarceration may be sufficient in some cases, but long periods may be insufficient in others. See *In re M.B.*, 39 Kan. App. 2d 31, 47-48, 176 P.3d 977 (2008) (sufficient when Father faced seven more months in prison, had been incarcerated throughout the proceedings and the young children's lives, and he did not try to maintain a relationship with them from prison); *In re T.H.*, 60 Kan. App. 2d 536, 551-53, 494 P.3d 851 (2021) (insufficient when Father faced five-year sentence but continued to support child financially, arranged for child's care while in prison, and they had a close relationship).

Here, sufficient evidence supports the district court's finding that Father's unfitness due to his conviction and incarceration was unlikely to change in the foreseeable future from M.T.'s perspective. Father received a 12-month sentence in late October 2021 after he admitted to violating his felony probation for threatening to kill both Mother and "the [bitch] ass kid." (It is unclear if he was referring to M.T. or her newborn sister.) So when the termination hearing was held in January 2022, Father faced up to nine more months' incarceration.

Along with his future incarceration, Father had been incarcerated for nearly the entire case and much of M.T.'s life; he was arrested for the threat a month after M.T. went into State custody, was released about a year later, then arrested again two months later for violating his probation. In total, he was incarcerated for all but two to three months of the year-and-a-half long case.

There is no evidence that Father had a strong relationship with M.T. or tried to develop one when he was not incarcerated. If anything, the evidence suggests the

9

opposite; Father's time with M.T. was marked by allegations of physical and emotional abuse of Mother and M.T. We are mindful that he began the case by telling his caseworker that he did not "want a god damn thing to do with the kids." Mother sought three protection from abuse orders against Father on her and M.T.'s behalf because she feared for their safety. And M.T. seemed to fear Father, running from him when he tried to change her diaper. Nor did Father communicate with or support M.T. from jail.

Father suggested that he would be released in April 2022—three months after the termination hearing. But the district court did not find his testimony credible—a finding this court cannot second-guess—and there is no other evidence showing an April release date. See *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). The journal entry for the conviction shows that he was eligible for 20 percent good-time credit, but even that time would seemingly bring his release date up to July or August 2022, or six to seven months after the termination hearing—not three.

Father asserts that *In re S.T.*, No. 121,376, 2019 WL 6795836 (Kan. App. 2019) (unpublished opinion), demands reversal under K.S.A. 38-2269(b)(5). In that case, the parties agreed that father had only six months left of incarceration—the reason for termination—and he previously had successful visits with the child and showed appropriate parenting skills. Here, there was evidence that Father had up to nine months left in his sentence and no evidence that he ever had successful visits or showed appropriate parenting skills. *In re S.T.* is distinguishable and not persuasive.

The court here rationally found it highly probable that Father's unfitness due to his felony conviction and incarceration would continue into the foreseeable future from M.T.'s perspective. The case began when she was two years old, and Father was then incarcerated for nearly all the rest of the case—approaching half of M.T.'s life. Father also faced a residential community corrections program and more probation after his release, and his recent history on probation showed many violations and difficulty

10

complying with it. The district court did not err in finding that Father's unfitness under K.S.A. 38-2269(b)(5) would likely continue into the foreseeable future.

II.    EVIDENCE OF THE AGENCY'S REASONABLE EFFORTS AND FATHER'S EFFORTS TO PARENT

Father argues that insufficient evidence supports the district court's unfitness findings under K.S.A. 38-2269(b)(7)—"failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family"—and K.S.A. 38-2269(c)(3)— "failure to carry out a reasonable plan approved by the court directed toward" reintegration. He asserts that Saint Francis' efforts were unreasonable because they failed to follow DCF policy on caseworker-parent contact and communicating the case plan to parents.

Our review of the record discloses that sufficient evidence supports the district court's findings that Saint Francis' reasonable efforts failed and that Father failed to carry out a reasonable parenting plan. A Saint Francis caseworker contacted Father through a phone call and text messages early in the case to work with him on beginning reintegration. The caseworker scheduled and held an initial case plan meeting by phone at which she communicated the case plan tasks to Father. Rather than work with his caseworker, he told her that he wanted nothing to do with his kids, that he wished Mother would die, and that he prayed that the caseworker or her unborn child would die. He also called the caseworker disparaging and inappropriate names.

Despite Father's threatening messages, the caseworker sent him two letters early on during his jail stay to update him on his daughters and communicate about case tasks. The caseworker sent him another letter a few months later, before M.T. and her sister reintegrated with Mother for several months. And when M.T. went back into State custody and Father was arrested again, his new caseworker sent him a letter and then

visited him in jail to discuss M.T.'s case. Despite these efforts, the only progress Father made in the case was completing a parenting class and submitting to a drug test. Sufficient evidence supports a finding that reasonable efforts by Saint Francis failed and that Father failed to carry out a reasonable reintegration plan.

Father points to two sections in DCF's "Policy and Procedure Manual" to argue that Saint Francis did not make reasonable efforts. The manual notes that there should generally be in-person contact between caseworkers and parents at least monthly in the family home when reintegration is the case goal. DCF PPM § 3237(5) (2022), http://www.dcf.ks.gov/services/pps/pages/ppspolicies.aspx. He points out that there was no in-person contact between him and Saint Francis until December 2021, the month before the termination hearing.

Father cites nothing in Kansas law suggesting that failing to follow the DCF Policy and Procedure Manual to the letter makes an agency's efforts per se unreasonable. Even so, this worker-parent visitation policy could not apply to Father's case; he was in jail for nearly the entire case and homeless when he was briefly out, so in-person contact "in the family home" was impossible. See DCF PPM § 3237(5). This case also took place during a global pandemic, which altered some of Saint Francis' normally in-person procedures. Nor does this section of the manual account for times when a parent threatens the caseworker and her unborn child. And the children were reintegrated with Mother when there was no contact between Saint Francis and Father.

Father also argues that the manual requires parents receive a physical copy of the case plan, yet he did not receive one until late in the case, if at all. But the cited provisions state generally that there should be a case-planning conference to review the case plan. DCF PPM § 3234. There was a telephonic case-planning conference here that Father attended where caseworkers went over the case plan with him. And because of the pandemic, the caseworker testified that Saint Francis likely mailed him a copy of it at his

12

last known address. Father testified that he never received it, but the district court did not find his testimony credible.

Nothing in this argument persuades us to reverse the district court on this point.

The district court also found that Father was unfit for a "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." K.S.A. 38-2269(b)(8). Father argues that this was improper because he had completed a parenting class and drug testing, and he testified that he had scheduled other tasks and could secure housing and employment upon his release.

Father essentially asks the court to reweigh the evidence on this point. See *In re B.D.-Y.*, 286 Kan. at 705 (appellate courts do not reweigh evidence or assess witness credibility). Father completed some tasks, but he did not complete many others. He committed a felony and then violated his probation for it, all while M.T.'s case was pending. And while Father testified that he could secure housing and employment after his release, he had taken no steps to do so and in fact had been living "on the streets" during his brief period out of jail during this case. Father also had no plans for M.T.'s care while he was incarcerated and testified that she could live with him in jail. Sufficient evidence supports the district court's finding that Father was unfit under K.S.A. 38-2269(b)(8).

III.    FAILURE TO MAINTAIN CONTACT WITH THE CHILD

The district court also found Father was unfit for "failure to maintain regular visitation, contact or communication with the child or with the custodian of the child." K.S.A. 38-2269(c)(2). Father argues that he maintained contact with M.T. or Saint Francis throughout the case.

In reality, Father had little contact with M.T., and this lack of contact was his own doing. There were no documented visits with M.T. during the case. This is unsurprising because Father committed, pleaded guilty to, and was incarcerated for a felony while M.T.'s case was pending, so he spent all but two or three months of it in jail. There is no evidence that Father tried to communicate with M.T. from jail. Father testified that he visited M.T. when he was briefly out of jail and they were reintegrated with Mother in the middle of the case, but caseworkers were unaware of any visits. And early in the case, Mother obtained temporary protection from abuse orders against Father on her and M.T.'s behalf. Sufficient evidence supports the district court's finding under K.S.A. 38-2269(c)(2). A contrary conclusion would require this court to reweigh the evidence.

We also hold that there was sufficient evidence that Father's unfitness under K.S.A. 38-2269(b)(7), (b)(8), (c)(2), and (c)(3) would continue into the foreseeable future. Father showed an unwillingness to make any meaningful changes throughout the case, which lasted close to half of M.T.'s life. His combative approach with caseworkers, combined with his felony conviction and incarceration, stalled most progress in the case. And at the termination hearing, with his parental rights on the line, Father continued his combative approach with the district court and the attorneys. In other words, Father has not shown that his unfitness is likely to change anytime soon from M.T.'s perspective or that he is prepared to work with Saint Francis toward reintegration. The evidence supports the district court's unfitness findings.

*We hold that termination of Father's parental rights was in the child's best interests.*

Father argues the district court abused its discretion when it terminated his parental rights. We review this finding for an abuse of discretion. *In re M.S.*, 56 Kan. App. 2d at 1264. Our standard of review is well established. A court abuses its discretion when no reasonable person would agree or when the decision is based on a legal or factual error. *In re R.S.*, 50 Kan. App. 2d at 1116.

14

We need not repeat all of the findings from the record. The evidence shows that M.T. needs a stable, nurturing, and consistent home environment. The trauma she has experienced in her life—including witnessing her sister's recent homicide and Father's domestic violence—is staggering. How does Father plan to help her overcome what she has seen and heard? The record is silent on this point.

We find no significant evidence of any father-daughter relationship between M.T. and Father given that Father was incarcerated throughout the case. And what little evidence there was suggested that M.T. feared Father because of his violent attacks that she has witnessed. She runs away and hides. We are not surprised.

At three-and-a-half years old, M.T. has been the focus of this case for a year and a half, and perhaps Father would not be available to parent her for at least several more months. Under these circumstances, a reasonable person could agree that termination was in M.T.'s best interests.

We affirm the district court's termination of Father's parental rights to M.T.